IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SIGHTSOUND TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:11-cv-01292-DWA |
| v. | ) | |
| | ) | Senior District Judge Donetta W. Ambrose |
| APPLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

SPECIAL MASTER'S REPORT AND RECOMMENDATION
ON CLAIM CONSTRUCTION

I.    RECOMMENDATION

It is respectfully recommended that the claim terms of the patents-in-suit be interpreted as set forth in the following report.

II.    REPORT

Plaintiff, Sightsound Technologies, LLC ("Sightsound"), filed this patent infringement action accusing Defendant, Apple, Inc. ("Apple"), of infringing various claims of its U.S. Patent Nos. 5,191,573 ("the '573 patent"), 5,675,734 ("the '734 patent") and 5,966,440 (the '440 patent") (collectively, "the Patents").  The Patents all stem from and claim priority to a patent application filed on June 13, 1988 ("the critical date") by Mr. Arthur Hair, which application eventually issued as the '573 patent.  The '734 patent and the '440 patent are "continuations" of the '573 patent and, as such, the Patents share common technical disclosures and drawings.

The Patents have been asserted in prior patent infringement actions before this Court. In *Sightsound.com, Inc. v. N2K, Inc. et al.*, Civil Action No. 2:98-cv-118-DWA ("the N2K case"), this Court adopted Magistrate Judge Benson's Report & Recommendation on Claim Construction ("the prior R&R"), which construed a significant number of the claim terms and phrases at issue here, in a Memorandum Order dated November 27, 2002 ("the prior Order")

(Docket # 90-13).[1] The N2K case was subsequently settled by the parties without a final judgment being entered by this Court.

Later, in 2004, the Patents were again asserted in *Sightsound Technologies, Inc. v. Roxio, Inc. et al.*, Civil Action No. 2:04-cv-1549-DWA ("the Roxio case").  The Roxio case was eventually stayed while the Patents were reexamined by the U.S. Patent & Trademark Office.  The '573 patent and the '734 patent remained unchanged upon completion of the reexamination proceeding while the '440 patent emerged with deleted, amended and new claims.  After the reexamination proceeding was completed, the parties settled the Roxio case.

Returning to the present litigation, pursuant to Local Patent Rule 4.2, on August 8, 2012, the parties filed a Joint Disputed Claim Terms Chart ("JDCT Chart") (Docket #82) listing those claim terms and phrases the meanings of which are in dispute and therefore need to be construed by the Court.  Subsequently, pursuant to LPR 4.3 and the Court's Case Management Order (Docket #42), the parties filed opening claim construction briefs on September 7, 2012, (Docket ## 90 & 91) and responsive claims construction briefs on September 28, 2012 (Docket ## 101 & 104).[2]  A claim construction hearing ("Markman hearing") was held before the undersigned on October 12, 2012, during which argument, demonstrative evidence and exhibits were presented by counsel for the parties.  Before turning to the construction of the disputed claim terms, however, a number of issues raised by the parties will first be addressed.

A.  The Prior Order and the Doctrine of *Stare Decisis*

Sightsound contends that this Court previously construed nearly all of the claim terms at issue here in the N2K case, and should defer to the constructions in its prior Order under principles of *stare decisis*.  (Docket #90, pgs. 2 and 7-8)[3].  To support its position, Sightsound proffers the underlying principles and benefits of *stare decisis*, contends that Apple has not

---

[1] Magistrate Judge Benson's initial Report & Recommendation, issued on February 8, 2002, is reported at 185 F.Supp.2d 445 (W.D.Pa. 2002).  Magistrate Judge Benson subsequently clarified his initial Report & Recommendation on April 2, 2002 (Docket #90-15).

[2] Sightsound included expert declarations and exhibits in its respective opening and responsive claim construction briefs (Docket ## 90 & 104).  Apple submitted expert declarations (Docket ## 92, 93, 108 & 109) and exhibit compilations (Docket ## 94 & 98) as separate docket entries.  These declarations and exhibits will be specifically identified and referred to, as necessary, below.

[3] Docket citations herein (except for Docket #101, which was filed under seal) are made to the page numbers listed in the headers of the ECF-filed versions.

shown that the prior claim constructions are clearly wrong (*Id.* at pg. 1, fn. 1) and posits that the prior constructions are apt to be more reliable because they were developed some 10 years ago and therefore much closer temporally with what one of ordinary skill in the art would understand those claims terms to mean at the critical date.  (Docket #120, Markman Tr. at pg. 15, l. 12-22).

Apple vigorously contests Sightsound's position and provides numerous grounds to support its assertion that *stare decisis* does not obligate this Court to adopt its prior constructions, including: (1) that the prior Order was a non-final, unappealed order and, thus, not a precedential decision (Docket #101, pg. 2); that Apple was not a party to the N2K case and, therefore, did not have an opportunity to litigate its claims (*Id.* at pg. *2-3.*); that new intrinsic evidence, developed subsequent to the prior Order in the reexamination proceeding during the Roxio case, is available for the Court to consider in construing the claim terms in dispute (*Id.* at pg. 3-4); that controlling claim construction law[4] has been developed by the Federal Circuit in the intervening years since the issuance of the prior Order (*Id.* at pg. 4); and that Sightsound itself is arguing new constructions that differ from those set forth in the prior Order (*Id.*).

The Supreme Court's *Markman* decision seemingly encourages deference to prior claim constructions in noting "the importance of uniformity in the treatment of a given patent as an independent reason to allocate all issues of construction to the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).  Further, the Supreme Court instructed that "treating interpretative issues as purely legal will promote (though it will not guarantee) intrajurisdictional certainty through the application of *stare decisis* . . . ."  (*Id.* at 390-91).  While the Federal Circuit has "recognize[d] the national *stare decisis* effect that [its] decisions on claim construction have[.]" (*Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998), the *stare decisis* effect of prior district court claim construction decisions is not as straight forward.

While a district court's claim construction is not binding precedent on the same judicial district or the same judge in a different case for purposes of *stare decisis*, the caselaw indicates

---

[4] *E.g.*, *Philips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) and *Aristocrat Techs. Austrl. PTY Ltd., v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006)

that district court claim construction decisions will be given careful consideration and considerable deference by later courts unless there is intervening case law or a new party that raises new arguments.  See *Amgen, Inc. v. F. Hoffmann-LaRoche Ltd.*, 494 F, Supp. 2d 54, 60 (D. Mass. 2007) (stating that a court is bound to follow a higher court's applicable holding, but need only give consideration and careful analysis to a sister court's decision where applicable to a similar fact pattern); *Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-90 (E.D. Tex. 2002) (expressing concern that refusing to consider a new party's claim construction arguments raised due process concerns and therefore granting the party's request for a *Markman* hearing); *Sears Petroleum & Transport Corp. v. Archer Daniels Midland Co.*, 2007 WL 2156251, at *8, *12 (N.D.N.Y. 2007) (stating that "considerable deference should be given to those prior decisions unless overruled or undermined by subsequent legal developments, including intervening case law" before proceeding to consider arguments that had not been heard during prior claim construction proceedings); *KX Industries, L.P. v. PUR Water Purification Products, Inc.*, 108 F.Supp.2d 380, 387 (D. Del. 2000) (holding that it would defer to its prior claim construction, but only "to the extent the parties do not raise new arguments"); *Townshend Intellectual Property, L.L.C v. Broadcom Corp.*, 2008 WL 171039 (N.D.Cal. Jan.18, 2008) (modifying prior claim construction in light of a new party's arguments); *Rambus Inc. v. Hynix Semiconductor Inc.*, 569 F.Supp.2d 946, 966-67 (N.D.Cal. 2008) (stating that "a fresh look at a claim construction can hone a prior court's understanding and construction of a patent" and deciding that "this court will initially treat its prior construction as correct, but consider the . . . arguments as to why a construction in [a prior proceeding] should be modified).

Based on the caselaw and the principles underlying the doctrine of *stare decisis*, the undersigned declines to either blindly adopt or wholly ignore the claim constructions set forth in the prior R&R and adopted in the prior Order.  Rather, the undersigned will carefully consider and give reasoned deference to the prior claim constructions to the extent that their viability is not impacted by intervening caselaw, new evidence or new arguments raised by the parties. This approach will balance the competing and compelling interests of promoting efficiency, uniformity and predictability in construing the claims terms of the Patents, ensuring the legal correctness of claim constructions based on intervening caselaw or new evidence or arguments,

and providing Apple -- a party who did not participate in the N2K case – an opportunity to be heard in this proceeding.

B.  Objections to Intrinsic and Extrinsic Evidence

The parties raise various objections to citations to intrinsic and/or extrinsic evidence in the claim construction briefs.  The undersigned will address those objections below.

1.  Apple's Objection to Sightsound's Citation to Intrinsic Evidence

Apple contends that Sightsound has violated Local Patent Rule 4.2 by citing to intrinsic evidence that it did not present in the JDCT Chart or in its appendix of intrinsic evidence (e.g., Docket #81).  (Docket #101, pg. 5 and Docket #107, pg. 1).  Apple correctly points out that Sightsound cites to no prosecution history in the JDCT Chart and, for all the "non-means" claims in dispute, cites only to the patent claims themselves (and not to other portions of the Patents' specification), yet refers to and relies on portions of the prosecution history and the Patents' specification in its briefs.  (*Id.*)

Sightsound responds that it notified Apple in July 2012 (in Sightsound's Identification of Proposed Claim Terms and Phrases for Construction, Docket #90-3) that it intended to rely upon the Court's prior Order in the N2K case and that, in the JDCT Chart, Sightsound cited to the Patents and to specific portions of the prior R&R, "which contained discussion of applicable intrinsic evidence."  (Docket #121, pg. 2-3 and 4).  Further, Sightsound maintains that it provided Apple with a complete disclosure of its positions and that every item of intrinsic evidence cited in its opening brief "was previously disclosed either by Sightsound or Apple, and Sightsound was entitled to cite to and discuss evidence identified by Apple in addressing Apple's positions in its Opening Brief."  (*Id.* at pg. 2 and 4).  Sightsound asserts that "no purpose would have been served by re-identifying each item of intrinsic evidence in the Joint Chart under these circumstances."  (*Id.* at pg. 2).

Sightsound's argument misses the point.  LPR 4.2 states, in relevant part, that "the parties shall prepare and file a Joint Disputed Claim Terms Chart listing claim terms and phrases and corresponding intrinsic evidence for each disputed claim term and phrase, asserted by each

party.  The Joint Disputed Claim Terms Chart shall be in the format shown in "Appendix LPR 4.2"."  (LPR 4.2) (emphasis added.).  LPR 4.2 states plainly that the corresponding intrinsic evidence for each disputed claim term and phrase must be listed in the JDCT Chart, and provides a form chart that includes a column for just that listing of intrinsic evidence.  LPR 4.2 does not suggest that a party can satisfy its obligation to cite to intrinsic evidence by relying on the other party's citation or by referring to an extrinsic document or information source, such as the correspondence between counsel or the prior R&R[5] relied on by Sightsound, that itself contains references to intrinsic evidence.  Sightsound's position would turn the purpose of LPR 4.2 on its head and allow a party to avoid having to provide its adversary with advance notice of the specific intrinsic evidence on which it intends to rely to advance its claim construction positions.

Having determined that Sightsound violated LPR 4.2, the question now turns to the remedy to be applied.  The Local Patent Rules are seemingly silent in this regard.  Apple requests that the intrinsic evidence not included by Sightsound in the JDCT Chart (and related argument) be stricken from Sightsound's briefing.  (Docket #101, pg. 6 and Docket #107, pg. 1).  Sightsound essentially claims "no harm, no foul" – that Apple has not been prejudiced or surprised because it was well aware of Sightsound's positions on claim construction.  (Docket #121, pg. 4).

While Sightsound's conduct here is not acceptable, the undersigned does not believe that striking the noted intrinsic evidence from Sightsound's briefing is the appropriate or correct remedy in this case.[6]  Apple has not been prejudiced to such an extent that warrants exclusion of the intrinsic evidence.  Certainly, Apple cannot refute that it has been aware of the intrinsic evidence – the Patents and their prosecution history – and its significance to claim construction since at least the beginning of this case.  Likewise, Apple has been on notice since at least as early as July 2012 that Sightsound was at least in part relying on the prior R&R for its proposed claim constructions in this case.

---

[5] Sightsound's citations to specific portions of the prior R&R are not even listed in the "Sightsound's Citation to Intrinsic Evidence" column of the JDCT Chart.  Rather, the prior R&R is cited to at numerous points in the "Sightsound's Proposed Construction" column.  (Docket #82).

[6] The District Court may of course consider other remedies that may be available outside the scope of the undersigned's appointment.

Most importantly, however, is the fact that the intrinsic evidence is the primary evidence used to properly construe the claims of a patent.  Given that exclusion of intrinsic evidence could result in improper or erroneous claim constructions, and in view of the absence of controlling precedent declaring that intrinsic evidence can be stricken for a party's failure to comply with local court rules, the undersigned declines to impose Apple's requested remedy to strike the noted intrinsic evidence from Sightsound's briefing.

## 2.   Apple's Objection to Sightsound's Proposed §112 ¶6 Constructions

Apple contends that Sightsound violated both LPR 3.2 and LPR 4.2 by failing to identify the function and corresponding structure disclosed in the Patents for those claim terms that Sightsound believes are governed under 35 U.S.C. §112 ¶6 (so-called 'means plus function' claims).[7]  (Docket #91, pg. 31-32 and Docket #101, pg. 5-6).  Apple's argument is not well taken.

LPR 4.2 requires, in relevant part, that the parties shall list in the JDCT "the claim terms and phrases and corresponding intrinsic evidence for each disputed claim term and phrase, asserted by each party."  In stark comparison to this language, LPR 4.3 requires that a party's "Opening Claim Construction Brief shall also, for each element which the party contends is governed by 35 U.S.C. §112(6), describe the claimed function of that element and identify the structure(s), act(s), or material(s) corresponding to that element."

The specific requirement of LPR 4.3 regarding the "function and corresponding structure" of disputed "means plus function" claims could have been included in LPR 4.2, but was not.  Given the difference in the language between LPR 4.2 and 4.3, the undersigned declines to rewrite or interpret the language of LPR 4.2 to require the specific identification of function and corresponding structure set forth in LPR 4.3.

---

[7] Sightsound's purported violation of LPR 3.2 will not be addressed here because it relates to Sightsound's infringement contentions (not claim construction), and is therefore outside the scope of the undersigned's appointment.

### 3.   Apple's Objections to Sightsound's Identification of Extrinsic Evidence

Apple also objects to and seeks to strike Sightsound's offer of any extrinsic evidence for its purported failure to serve and file an identification of such evidence pursuant to LPR 4.3. (Docket #107, pg. 1).  Apple's argument is without merit.

LPR 4.3 requires that "[a]t the same time the party services its Opening Claim Construction Brief, that party shall serve and file an identification of extrinsic evidence, including testimony of lay and expert witnesses the party contends supports its claim construction."

In this case, Sightsound served and filed witness declarations and other extrinsic sources of evidence as separate attachments to its Opening Claim Construction Brief.  (See Docket ##90-1 – 90-16).  While Sightsound did not serve and file its extrinsic evidence in a separate document as Apple did (see Docket #94), LPR 4.3 does not appear to specifically require that extrinsic evidence be submitted in a separate document in order to be properly considered in the claim construction analysis.  In any event, Apple does not and cannot claim to be prejudiced by Sightsound's timely filing of the extrinsic evidence as attachments to its Opening Claim Construction Brief.[8]

### 4.   Sightsound's Objections to Apple's Extrinsic Evidence

Sightsound objects to a majority of Apple's cited extrinsic evidence "because (1) they are not contemporaneous with the invention or (2) contradict the unambiguous terms of the specification."  (Docket # 104, pg. 2).

Apple responds that (1) Sightsound has not cited any authority for barring post-dated (i.e., after the critical date) extrinsic evidence from consideration in the claim construction analysis and (2) its extrinsic evidence reinforces Apple's correct claim constructions, which are consistent with and supported by the intrinsic evidence.[9]  (Docket #122, pg. 1 and 5).

---

[8] Magistrate Judge Hay appears to have reached the same conclusion in *Copper Innovations Grp., LLC  v. Nintendo Co.*, 2009 WL 8080100, at *31 n. 17 (W.D. Pa. Oct 6, 2009).

[9] Sightsound objected to Apple's Response (Docket #122) because (1) the Court did not instruct Apple to file any response during the Markman hearing on October 12, 2012, and (2) LPR 4.3 does not contemplate or authorize a response filing.  The undersigned has decided to entertain Apple's Response because he believes the transcripts of the technology tutorial (held on October 11, 2012) and the Markman hearing are ambiguous as to whether Apple

The Federal Circuit has confirmed that courts are free to consider extrinsic evidence because it "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean . . .." *Philips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).  Nevertheless, the Federal Circuit has cautioned that extrinsic evidence is generally less reliable than the intrinsic evidence in construing claim terms.  *Id.* Thus, a court should discount any extrinsic evidence that contradicts the claim construction supported by the intrinsic evidence (the claims themselves, the written description and the prosecution history).  *Id.* (citations omitted).

Sightsound has cited no authority for a per se rule that post-dated extrinsic evidence should not be considered for purposes of claim construction.  In fact, both Sightsound and Apple cite to post-dated extrinsic evidence – and each object to the other's proffer of that evidence.

Further, Sightsound's request for the Court not to consider Apple's extrinsic evidence can be addressed during the claim construction analysis, if in fact the noted extrinsic evidence even is considered by the undersigned in rendering a recommendation.   Considering the safeguards articulated by the Federal Circuit, the undersigned does not believe that a wholesale rejection of the noted extrinsic evidence cited by Apple is warranted.  Rather, the undersigned will use his discretion in considering such evidence, if there is a need to do so in the claim construction analysis.

C.   Construction of the Disputed Claim Terms

1.   Introduction to the Patents

The Patents here are directed to "a system and associated method for the electronic sales and distribution of digital audio or video signals, and more particularly, to a system and method which a user may purchase and receive digital audio or video signals from any location which the user has access to telecommunication lines."  (Docket #81-3, pg. 5, col. 1, l. 15-21).

---

requested or preserved a right to file a Response, and further because LPR 4.3 does not appear to specifically address the filing of responses to objections to extrinsic evidence when, as here, the briefing schedule required the filing of both responsive claim construction briefs to occur contemporaneously.

In describing the sales, distribution and transferability of music at or prior to the critical date, the named inventor of the Patents, Mr. Hair, discussed a number of drawbacks to then-current music media: records, tapes and compact discs (collectively, "the prior art media").  (*Id.* at col. 1-2).  From a capacity standpoint, Mr. Hair noted that the prior art media was limited in the amount of music that can be stored on each unit.  (*Id.* at col. 1, l. 27-29).  The prior art media also limited a user's ability to play, in a user-selected sequence, songs from different albums.  (*Id.* at l. 39-44).  From a sales and distribution standpoint, Mr. Hair described the need to physically transfer the prior art media from the manufacturing facility to the wholesale warehouse to the retail warehouse to the retail outlet prior to final purchase, resulting in lag time between music creation and marketing as well as the resulting transfer and handling costs. (*Id.* at l. 45-51).  Mr. Hair also noted that, until the invention of Digital Audio Music (music converted into binary code (a series of ones and zeros)), as used on compact discs, distortion-free transfer of the music from records and tapes to a stereo system was virtually impossible. (*Id.* at l. 55-63).

Summarizing the drawbacks to the prior art media and their sale and distribution, Mr. Hair explained that the "inflexible form in which the songs are purchased by an end user, and the distribution channels of the songs, requires the end user to go to a location to purchase the songs, and not necessarily be able to purchase only the songs desired to be heard, in a sequence the end user would like to hear them."  (*Id.* at col. 2, l. 14-20).

In subsequent passages of the Patents, Mr. Hair explains that his invention provides "a new and improved methodology/system of electronic sales, distribution, storage, manipulation, retrieval, playback and copyright protection of Digital Audio Music."  (*Id.* at col. 2, l. 23-44).  Mr. Hair describes a number of the benefits of his invention, including the high speed transfer of Digital Audio Music for storage onto a hard disk, the recall of stored music for playback as selected or programmed by the user, the sorting of stored music based on different criteria, such as music category, artist, or user's favorite songs, and the random playback of music based on the user's selection.  (*Id.* at l. 44-61).

With respect to transfer or distribution of music, Mr. Hair discloses that Digital Audio Music can be transferred from a source authorized by the copyright holder to sell and distribute

the copyrighted materials (i.e., the Digital Audio Music) (*Id.* at pg. 5, l. 65-67 and pg. 3, Figure 1).  Mr. Hair further explains that the "electronic sales and distribution of the music can take place via telephone lines onto a hard disk" and that his "new methodology/system of music sales and distribution will reduce the lag time between music creation and music marketing . . . . " (*Id.* at pg. 6, l. 8-12).

### 2.   The Claims of the Patents

Sightsound contends that eighty-four (84) claims of the Patents are infringed by various Apple devices.[10]  (Docket #90, pg. 10).  A representative asserted claim from each of the Patents is summarized below.

Claim 1 of the '573 patent relates to a method of transmitting a desired digital audio signal from a first party to a second party, including the steps of: (1) transferring money electronically via a telecommunications line to the first party from the second party; (2) electronically connecting via a telecommunications line a first memory of the first party with a second memory of the second party so that the desired digital audio signal can pass therebetween; (3) transmitting the desired digital audio signal from the first memory to the second memory; and (4) storing the digital signal in the second memory.  (Docket #81-1, pg. 7, col. 6, l. 4-24).

Claim 4 of the '734 patent relates to a system for transferring digital audio signals, including: (1) a first party control unit having a hard disk including desired digital audio signals, a sales random access memory chip electronically connected to the first party hard disk, and means for electronically selling the desired digital audio signals; (2) a second party control unit having a control panel, a second memory connected to the control panel, and means for playing the desired digital audio signals connected to the second memory and the control panel; and (3) telecommunications lines connected to the first party control unit and the second party control unit through which the electronic sales and transfer of the desired digital audio signals occur after the desired digital audio signals are sold to the second party by the first party.  (Docket #81-2, pg. 9, col. 9, l. 41 to col. 10, l. 6).

---

[10] Sightsound provided an appendix of the asserted claims of the Patents in its Opening Claim Construction Brief (Docket #90, pg. 59-79).

Claim 23 of the '440 patent relates to a system for transmitting desired digital audio signals stored on a first memory of a first party to a second memory of a second party, including: (1) means for transferring money electronically via telecommunications lines from the second party to the first party, the second memory including a non-volatile storage portion that is not a tape or CD; (2) means for connecting electronically via telecommunication lines the first memory with the second memory such that the desired digital audio signals can pass therebetween; (3) means for transmitting the desired digital audio signals from the first memory with a transmitter to a receiver having the second memory of the second party; (4) means for storing the digital audio signals in the non-volatile storage portion of the second memory; and (5) means for playing the digital audio signals stored in the non-volatile storage portion of the second memory.

In the JDCT, the parties filed a list of forty (40) disputed claim terms or phrases (or groups of similar claim terms or phrases) for construction, including many "means plus function" claims terms that are governed by 35 U.S.C. §112, ¶6.[11]  (Docket #82).  Before turning to the construction of the disputed claim terms, the law applicable to claim construction will be briefly reviewed.[12]

### 3.   The Law of Claim Construction

Claim construction is a matter of law for the Court to decide.  *Markman v. Westview Instr., Inc.*, 517 U.S. 370 (1996).  "[T]he words of a claim 'are generally given their ordinary and customary meaning,' [which] . . . is the meaning that the [words] would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (internal citations omitted). When construction is necessary, one considers claim language itself, other claims in the patent, the specification and the prosecution history.  *Id.* at

---

[11] The parties dispute whether all the disputed claim terms reciting "means" language are governed by 35 U.S.C. §112, ¶6.

[12] The parties do not seem to seriously contest the characteristics and knowledge of a person having ordinary skill in the art ("PHOSITA") to which the subject matter of the claims pertain.  (Docket #90-1, pg. 3-4, and Docket # 93, pg. 5).  Therefore, for this case, the PHOSITA is a person having an undergraduate degree in electrical engineering or computer science and/or approximately 2-4 years of industry experience in the design of systems and methods for storing and transmitting digital information.

1313-18.  Because of their context, "[t]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id*. at 1314.

The court looks to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention. *Id.* at 1313.  Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  *Id.* at 1314.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.  *Id.*  "For example, the presence of a dependent claim that adds a particular limitation gives rise to the presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

"The claims, of course, do not stand alone ... [and] 'must be read in view of the specification, of which they are a part.'"  *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978-979).  "The specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics*, 90 F.3d at 1582).  In that regard, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*. at 1313.  "The importance of the specification in claim construction derives from its statutory role.  The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'"  *Id*. at 1311 (quoting 35 U.S.C. §112, ¶1).

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  *Id*. at 1316.  "In such cases, the inventor's lexicography governs."  *Id*. (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  "[T]he specification may [also] reveal an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id*.  "In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  *Id*. (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2519)).

13

"In addition to consulting the specification, . . . a court 'should also consider the patent's prosecution history.'" *Id*. at 1317 (quoting *Markman*, 52 F.3d at 980).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*. (citing *Vitronics*, 90 F.3d at 1582-83).

When construing claims, extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises'" may also be relied upon. *Id*. at 1317 (quoting *Markman*, 52 F.3d at 980). "Extrinsic evidence can help educate . . . regarding the field of the invention and can help . . . determine what a person of ordinary skill in the art would understand claim terms to mean." *Id*. at 1319.  Nevertheless, although "extrinsic evidence may be useful . . . it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*.

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id*. at 1316.  "[A] patentee may not proffer an interpretation . . . that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'" *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) (quoting *Senmed, Inc. v. Richard-Allan Med. Indus.*, 888 F.2d 815, 819, n. 8 (Fed. Cir. 1989)).

A special issue of claim construction arises with "means plus function" claim terms.  The construction of these claims terms is governed by 35 U.S.C. §112, ¶6.[13]  "Means plus function" claiming applies only to "purely functional limitations that do not provide the structure that performs the recited function." *Dupuy Spine, Inc. v. Medtronic Sofamor Sanek, Inc.*, 469 F.3d 1005, 1023 (Fed. Cir. 2006).  There is a rebuttable presumption that §112, ¶6, applies "[i]f the word 'means' appears in a claim element in association with a function." *Callicrate v.*

---

[13] An element for a combination may be expressed as a means or a step for performing a specific function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005).  The use of "means" language in a claim limitation implies that the inventor intended to avail herself of the means plus function claim format provided by §112, ¶6.  *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996).  Nevertheless, the presumption does not apply where the claim language itself provides the structure that performs the recited function.  *Phillips*, 415 F.3d at 1311 (finding that a claim limitation stating "means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles" provides the relevant structure ("internal steel baffles") and hence is not limited to the embodiments in the specification and equivalents thereof); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (finding that use of the phrase "perforation means" does not invoke §112, ¶6).

If the Court concludes that §112, ¶6, applies to a claim term, then the Court must first identify the function associated with that claim language and then identify the structure, material, or acts in the specification corresponding to the claimed function.  *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005); *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005).

Where an inventor invokes "means plus function" claiming for a computer-implemented invention, the structure disclosed in the specification must "be more than simply a general purpose computer or microprocessor."  *Aristocrat Techs. Austrl. Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  The Federal Circuit explained that "[b]ecause general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of that claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112, paragraph 6."  *Id.*  Instead, the Federal Circuit requires "that the specification 'disclose an algorithm for performing the claimed function.'"  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008)).  "The specification can express the algorithm 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'"  *Id.* (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)).  The Federal Circuit has "imposed the algorithm

requirement to prevent purely functional claiming when a patentee employs a special purpose computer-implemented means-plus-function limitation." *Id.* at 1318.  If the specification does not disclose an algorithm to perform the function associated with a computer-implemented means-plus-function limitation, the claim limitation is indefinite.  *Id.* at 1319.

### 4.   The Disputed Claim Terms

Turning now to the disputed claim terms, the claim terms (or groups of claim terms) will be addressed in the order agreed to and presented by the parties during the Markman hearing.

### i.   "First Party" / "Second Party" Terms

### 1.   "First Party" and "Second Party"

These "first party" and "second party" terms are used throughout the Patents, referring to the two entities that interact for the sale and transfer of digital audio signals stored on a first memory of a first party to the second memory of the second party.  (Docket #81-1, pg. 2).  The claims repeatedly refer to various steps performed by a first party and those performed by a second party.  For example, the specification and numerous claims recite the step of "transferring money . . . to the first party from the second party."  (*Id.* at pg. 6, col. 3, l. 6-8, and pg. 7, col. 5, l. 32-34 and col. 6, l. 8-15).  The specification and claims further recite "the step of transmitting the desired digital audio signal from the first memory with a transmitter in control and in possession of the first party to a receiver . . . in possession and in control of the second party."  (*Id.* at pg. 6, col. 3, l. 12-18, and pg. 7, col. 5, l. 38-44 and col. 6, l. 18-23).

The parties' proposed constructions for these terms are provided below:

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| First Party | an entity, whether a corporation or a real person, possessing and/or controlling the stated structure, or performing the necessary steps for the claims | a first single entity, whether a corporation or real person |
| Second Party | an entity, whether a corporation or a real person, possessing and/or controlling the stated structure, or performing the necessary steps for the claims | a second single entity, whether a corporation or real person |

The parties seemingly agree that a "party" may be a corporation or a real person, but thereafter part ways.  Apple contends that Sightsound's construction would eliminate the words "first" and "second" from the claim terms.  In so doing, Apple points out that Sightsound's proposed construction could result in the same entity being both the "first party" and the "second party."  (Docket #91, pg. 4-5).  Apple's point is well-taken.

The Patents make clear that the disclosed invention is a method for transmitting digital audio signals . . . of a first party to . . . a second party.  (Docket #81-1, pg. 6, col. 3, l.3-6).  Various claims of the patents require the step of "transferring money electronically . . . to the first party . . . from the <u>second party financially distinct from the first party</u> . . .."  (*Id.* at pg. 7, col. 6, l. 8-12) (emphasis added).  Mr. Hair, the named inventor of the Patents, declared during the prosecution of the Patents that "[o]ne skilled in the art would also know since the music is distributed through electronic sale, 'the second party must be financially distinct from the first party' or there could be no sale."  (Docket #80-9, pg. 4).  Obviously, the purpose and objective of the Patents – the sale and distribution of music – would be nonsensical if the "first party" and the "second party" could be the same corporation or person.

Apple does not stop there, but goes a step farther by cautioning that Sightsound's proposed construction would permit multiple distinct entities to perform the role of the "first party" and the "second party".  (Docket #91, pg. 10, and Docket #101, pg. 7).  To alleviate this concern, Apple proposes that the term "single" be adopted in the construction (as in "first single entity" and "second single entity").  (Docket #91, pg. 12-13).  In this, Apple's argument goes a step too far.

The intrinsic evidence does not support Apple's position that the "first party" and the "second party" must be "single" entities.  Mr. Hair's Declaration in the prosecution history is not helpful to Apple's cause because the cited passage (Docket #80-9, pg. 4) relates to the premise (addressed above) that the "first party" and the "second party" are not the same entity.  On the contrary, the specification of the Patents suggests to the undersigned that the "first party" may include two related or authorized entities or individuals.

Specifically, in discussing the prior art media, Mr. Hair advises that "strict control and enforcement of copyright laws have proved difficult and impossible with home recorders."

(Docket #81-1, pg. 5, col. 2, l. 2-4).  Mr. Hair subsequently declares that his invention "can be configured to accept Digital Audio Music from <u>a source authorized by the copyright holder to sell and distribute the copyrighted materials</u>, thus guaranteeing the protection of such copyrighted materials."  (*Id.* at l. 54-58) (emphasis added).  Later in the Patents, in referring to Figure 1 thereof, Mr. Hair identifies the "hard disk" in two separate passages as the "10 Hard Disk of the copyright holder" (*Id.* at pg. 6, col. 3, l. 46) and the "Hard Disk 10 of the agent authorized to electronically sell and distribute the copyrighted Digital Audio Music . . . ." (*Id.* at l. 60-62).  Taken in context with the cited specification passages, the claim term "first party" could include two entities -- (1) a copyright holder and (2) a source or agent authorized by the copyright holder.  Consequently, the undersigned declines to include the term "single" in the construction of the terms "first party" and "second party".[14]

Finally, Apple contends that the inclusion of the language "possessing and/or controlling the stated structure, or performing the necessary steps for the claims" in Sightsound's proposed construction is "extraneous" and "merely describes the role(s) of the 'first party' and the 'second party' that are covered by the remainder of the claims."  (Docket #91, pg. 11-12).  The undersigned agrees.

With all due respect to Magistrate Judge Benson and the prior R&R, the undersigned believes that the noted language may actually render the claim term more ambiguous for the trier of fact.  If the noted language were inserted into the asserted claims in place of each recitation of the "first party" and the "second party" for purposes of determining infringement, the result would be problematic at best.  For example, just the preamble of asserted claim 1 of the '573 patent would read as follows: A method for transmitting a desired digital audio signal stored on a first memory of [an entity, whether a corporation or a real person, possessing and/or controlling the stated structure, or performing the necessary step for the claims] to a second memory of [an entity, whether a corporation or a real person, possessing and/or

---

[14] The undersigned believes that this outcome is also consistent with the prior R&R in which Magistrate Judge Benson declined to construe the terms "first party" and "second party" to "require that a party act on its own behalf for purposes of the claims in suit . . . ."  *Sightsound.com Inc. v. N2K, Inc.*, 185 F.Supp.2d 445, 468-69 (W.D.Pa. 2002).  Further, consistent with Magistrate Judge Benson's refusal to add the term "agent" to the terms "first party" and "second party," the undersigned believes that the issue of whether "party" may include more than one entity or person is an infringement issue better left to the trier of fact.

controlling the stated structure, or performing the necessary step for the claims].  Including the noted language in the construction would not clarify the meaning of the "first party" and "second party" claim terms, but rather would actually work to increase ambiguity in the claim language.

The undersigned therefore recommends that the claim terms "first party" and "second party" be construed as follows:

| Term | Recommended Construction |
|------|--------------------------|
| First Party | a first entity, whether a corporation or a real person |
| Second Party | a second entity, whether a corporation or a real person |

2. "First Party Control Unit", "Second Party Control Unit", and Related Terms[15]

The parties' dispute concerning these claim terms appear to primarily relate to other claim terms in dispute, such as the proper meaning of the term "first party" addressed above. Sightsound claims that Apple's construction is an end-around attempt to limit the term "first party" and "second party" to a "single" entity.  (Docket #90, pg. 23-24).  Apple posits that Sightsound's construction is an erroneous attempt to "read out" the terms "first party" and "second party" from those terms.  (Docket #101, pg. 7).

The parties' proposed constructions for these terms are provided below:

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|------|-----------------------------------|-------------------------------|
| First Party Control Unit | first party control unit | control unit of the first party |
| Second Party Control Unit | second party control unit | control unit of the second party |

The specification and claims of the Patents make clear that the terms "first party" and "second party" are often used in conjunction with various system components to associate them with those parties.  For example, referring to Figure 1 of the Patents, various system components of the two parties – the copyright holder/agent and the user – are identified by

---

[15] The related terms are listed in the JDCT (Docket #82, pg. 10-12) and Apple's Opening Claim Construction Brief (Docket #91, pg. 14).

the same term: hard disk (10, 60), control unit (20, 50), control panel (20a, 50a), and control integrated circuit (20b, 50b).  (Docket #81-1, pg. 3, Figure 1, and pg. 6, col. 3, l. 44-60).

To clearly associate the system components with the corresponding entity, the terms "first party" and "second party" are simply used in conjunction with those system components in the specification and the claims of the Patents.  This use of "first party" and "second party" in conjunction with the respective components has no bearing on the underlying meaning of the terms "first party", "second party" or the components themselves.  Apple's construction is the one that most clearly associates the components with the corresponding "party" (rather than merely restating the terms), consistent with the context and meaning of the specification and claims.  Consequently, the undersigned recommends that Apple's constructions be adopted for these claim terms: control unit of the first party and control unit of the second party.

ii.   *"Telecommunications Lines" / "Telephone Lines" / "Lines"*

The terms "telecommunications lines" and "telephone lines" are used throughout the specification and claims of the Patents, but they are not explicitly defined therein.  Therefore, the meaning of the claim terms will need to be determined by reading the terms in the context of the claims and the Patents as a whole, including the specification and relevant prosecution history.

The invention disclosed in the Patents is related to the sales and distribution of digital audio signals in which a user may purchase and receive the digital audio signals <u>from any location where the user has access to a telecommunications or telephone line</u>.  (Docket #81-1, pg. 5, col. 1, l. 9-15, and pg. 6, col. 3, l. 63-67) (emphasis added).  To accomplish the sale and transfer of the digital audio signals, various claims recite that money is transferred electronically via a telecommunications line <u>to the first party at a location remote from the second party</u> and, further, that the digital audio signals are transmitted <u>from the first party to a receiver at a location determined by the second party</u>.  (*Id.* at pg., 7, col. 6, l. 8-24) (emphasis added).  Consequently, from the context of the specification and claims of the Patents, the construction of "telecommunications lines" and "telephone lines" must be such as to permit the transfer of money and digital signals between a seller of digital audio signals and various purchasers / users of the purchased digital audio signals, all of whom will be at indeterminate

and varying locations for their transactions.  With that context in mind, the parties' proposed constructions are provided below:

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| Telecommunications Lines | an electronic medium for the transmission of information from one location to another | an electronic line for communicating between computers, which requires end-to-end connectivity |
| Telephone Lines | an electronic medium for the transmission of information from one location to another | electronic lines for telephone calls |
| Lines | an electronic medium for the transmission of information from one location to another | Wire |

1. "Telecommunications Lines"

The primary dispute between the parties appears to be whether the term "telecommunications lines" require "end-to-end connectivity".  Apple insists that "the entire connection between the computers, rather than just a portion of it, must be an 'electronic line.'"[16]  (Docket #91, pg. 17).  Apple supports its position in various ways, including:  (1) the Court's prior construction that the term "telecommunications lines" is an <u>electronic</u> medium; (2) the Court's observation that the term "telecommunications lines" is used most often in conjunction with the terms "connecting" and "electronically"; and (3) that the term "electronic" is understood by a person of ordinary skill in the art to involve the "flow of electrons."  (*Id.*)

Sightsound responds that the "end-to-end connectivity" limitation is inappropriate because it describes how the lines are used but is not a property of the lines themselves. (Docket #90, pg. 19).  Sightsound's point is well-taken.

The prior R&R considered at length the proper construction of the term "telecommunications lines."  The undersigned finds Magistrate Judge Benson's analysis of the intrinsic and extrinsic evidence as it relates to "telecommunications lines" to be well-

---

[16] While not explicitly included in its proposed construction, Apple's briefing indicates that it is advocating an "end-to-end <u>electronic</u> connectivity" limitation for the construction.  (Docket #91, pg. 17-18).

considered, thorough and consistent with current claim construction principles and caselaw.[17]
See *Sightsound.com*, 185 F.Supp.2d at 474-78.  However, the undersigned does part ways with
the prior R&R with regard to the "end-to-end connectivity" limitation.

As noted correctly in the prior R&R, "telecommunications lines" is most often used in
the claims in conjunction with the terms "connecting" and "electronically."  *Id.* at 478.  The use
of those terms in various claims is instructive: "telecommunications lines connected," "forming
a connection through telecommunications lines," and "connecting electronically via a
telecommunications line."

The "telecommunications lines" always appears to be used to "connect" various
components of the invention, often "electronically."  Nevertheless, the limitation "end-to-end
connectivity" adds or incorporates attributes of "connection" into the construction of
"telecommunications lines," which results in extraneous or redundant claim language.  For
example, if Apple's proposed construction were adopted the trier-of-fact would have to apply
the following claim language for determining infringement: (1) "forming a connection through
[an electronic line for communicating between computers, which requires end-to-end
connectivity]"; and (2) "connecting electronically via [an electronic line for communicating
between computers, which requires end-to-end connectivity]".  Basically, the "transmissions
lines" term would be defined in part by a "connection" term that is already included in the
claim language itself.  The undersigned believes that Apple's proposed construction would work
to increase ambiguity in the claim language.

To support its position, Apple also cites to the reexamination prosecution history of the
Patents and the declaration of Sightsound's expert, Dr. Tygar, which Magistrate Judge Benson
did not have when he prepared the prior R&R.  (Docket #91, pg. 18).  While Dr. Tygar's
declaration does state in one passage that the "invention of the '573 patent comprises a
number of steps" including "[f]orming an end-to-end electronic connection over the
telecommunication lines between [the seller's and buyer's computer memories]" (*Id.*), the
undersigned does not believe that this selected passage from the intrinsic evidence is sufficient
to overcome the rationale provided above in arriving at a construction that focuses on the

---

[17] The prior R&R also includes a thoughtful and well-reasoned analysis of the patentee's unsuccessful attempt to
include the term "telecommunications link" in the Patents.

22

attributes of the term "telecommunications lines" itself without including redundant "connection" language provided by the claim terms.  Consequently, the undersigned recommends that an abridged version of the construction from the prior R&R be adopted for "telecommunication lines": an electronic medium for communicating between computers.

2.  <u>"Telephone Lines"</u>

The term "telephone lines" was not construed by the Court in the N2K case.  While the parties agree that the term should be construed to include "electronic," that appears to be the extent of their agreement.

Sightsound advances the same construction for "telephone lines" as it does for "telecommunications lines," even though it admits that "the terms are clearly not identical." (Docket # 104, pg. 14).  Apple contends that "telecommunications lines" and "telephone lines," being different terms, should be given different meanings.  (Docket #91, pg. 16 and 20).  The undersigned agrees.

The original 1988 patent application, from which the Patents stem, disclosed and claimed "telephone lines."  The term "telecommunications lines" was added to the claims during prosecution in 1991.  (Docket # 80-7, pg. 7-10).  Sightsound clearly intended for the terms to have different meanings, otherwise there would have been no need for Sightsound to add "telecommunications lines" during the prosecution of the Patents.  This is consistent with Sightsound's position that "a telephone line is an embodiment of a telecommunications line" and with various dependent claims of the Patents which require that "the telecommunications lines include telephone lines."  (Docket #90, pg. 20-21).

Apple contends that the term "telephone lines" should be construed to include a limitation directed to "telephone calls."  (Docket #91, pg. 20).  Apple's proposed construction would, under the guise of "plain and ordinary meaning," interject unnecessary ambiguity into the construction by raising the proper meaning of the term "telephone calls."  As Sightsound correctly notes, a trier-of-fact may interpret "telephone calls" to mean a "person-to-person call" (Docket #90, pg. 21) even though Apple agrees that "[a] 'telephone call' can be made by a person or a machine to a person or a machine . . .."  (Docket #101, pg. 11).

The intrinsic evidence is not particularly helpful in ascertaining the meaning of the term "telephone lines," apart from the use (noted above) of the term in dependent claims that recite that "the telecommunications lines include telephone lines."  The inventor's description of "telephone lines" as "electrical lines" in a single instance in the long prosecution history of the Patents is insufficient, in the undersigned's opinion, to limit the 'telephone lines" term to "electrical lines," as Apple proposes.  (Docket #101, pg. 11).

Likewise, the extrinsic evidence provided by the parties in, for example, expert declarations and dictionary definitions, is often contradictory and not helpful in explaining the use of the related terms "telecommunications lines" and "telephone lines" in the intrinsic record.  Keeping in mind that the parties agree that "electronic" should be included in the construction, and that various dependent claims require that the "telecommunications lines include "telephone lines," the undersigned recommends a construction of "telephone lines" that is consistent with both the construction of "telecommunications lines" and their use together in the noted dependent claims: an electronic medium for telephonic communication.

### 3.   "Lines"

Apple proposes that the term "lines" needs to be separately construed.[18]  Sightsound correctly points out that the term "lines" only appears in the Patents in conjunction with the terms "telecommunications" or "telephone."  (Docket #104, pg. 14).  The undersigned sees no basis in the intrinsic record for parsing the term "lines" and declines to do so here.  To construe "lines" separate from "telecommunications lines" and "telephone lines," and then use that definition to inform the construction of "telecommunications lines" and/or "telephone lines," could distort the construction of those terms in a way not supported by the intrinsic evidence.

---

[18] Apple asserts that the term "line" means a physical "wire" and thus excludes wireless communications.  (Docket #91, pg. 21).

iii.  "Connecting Electronically" Terms

The parties seek construction of a number of terms containing "connecting" and/or "electronically."

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|------|-----------------------------------|-------------------------------|
| "Connecting" Terms | connecting | distinct objects joined with each other |
| "Electronic" Terms | electronic | through the flow of electrons |
| "Connecting Electronically" Terms | linking, as described and recited in the claims, not requiring a hard-wired conduction path | connecting for the flow of electrons from one object to another |
| "Transferring Electronically" Terms | transferring through the use of telecommunications lines, as recited in the claims | Transferring through the flow of electrons from one object to another |

These terms will be addressed below.

1.  "Connecting" Terms

The terms "connecting," "connected" and "connecting" are used throughout the specification and claims of the Patents.  Sightsound argues that there is no need to construe these claims terms.  (Docket # 104, pg. 17).  Apple's proposed construction for the "connecting" terms is "distinct objects joined with each other."  (Docket #91, pg. 23).

When used alone, the intrinsic evidence does not appear to provide any special meaning for the "connecting" terms.  These terms are non-technical terms in plain English – claim construction should not create ambiguity by paraphrasing claim language or reading limitations into the claims to obviate factual questions of infringement.  *See American Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324 (Fed. Cir. 2011) ("It is well-settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.").

Apple's proposed construction of the "connecting" terms includes recitations to the objects -- "distinct objects" -- being connected, includes a term -- "joined" – that is similar to "connecting" and then describes how the objects are "joined" – "to each other."  Inserting Apple's proposed construction into the claims in place of "connecting" would result in redundancies and resulting ambiguity to the trier-of-fact: "telecommunications lines [distinct objects joined to each other] to the first party control unit and the second party control unit . . .."  (See e.g., Claim 4 of the '734 patent).  Consequently, the undersigned recommends that Apple's proposed construction be discarded and the "connecting" terms not be construed for the trier-of-fact.

### 2.  "Electronic" Terms

The parties approach the "electronic" terms in a fashion similar to the "connecting" terms.  Sightsound contends that the terms do not need construing.  (Docket #90, pg. 28).  Apple insists that the "electronic" terms be construed to mean "through the flow of electrons."  (Docket #91, pg. 25).  In this instance, the undersigned disagrees with Sightsound and believes that the "electronic" terms are technical terms that need to be construed for the trier-of-fact, especially for their use in conjunction with other terms (e.g., "connecting" and "transferring") addressed below.

Sightsound contends that the "electronic" terms "relate to the components and lines necessary to practice the invention[.]" and that the patented invention "utilizes electron devices."  (Docket #90, pg. 28).  Sightsound cites to a dictionary definition of "electronic" (*Id.*), but then criticizes Apple's own proposed, dictionary-based construction as not being supported by the intrinsic evidence.  (Docket #104, pg. 17).

The specification and claims of the Patents make clear that a number of electronic components are connected to provide the sale and transfer of digital audio signals.  For example, referring to Figure 1 of the Patents, the seller's control panel 20A, control integrated circuit 20B, hard disk 10 and Sales Random Access Memory 20C are electronic components that are connected.  (Docket #81-1, pg. 3).  However, the intrinsic evidence does not specifically

define what is meant by the "electronic" terms, even though those terms appear frequently in the specification and claims of the Patents.

Notably, the parties have both cited to extrinsic, dictionary definitions for the proper construction of the "electronic" terms.  Apple cites to definitions that recite the "flow of electrons" and "of or relating to electrons."  (Docket #91, pg. 25).  Sightsound asserts a dictionary definition of "electronic" as "utilizing electron devices" (Docket #90, pg. 28), which leaves open the meaning of the term "electron", but then later claims that Apple's cited dictionary definition ("pertaining to devices or systems which depend on the flow of electrons") actually supports its position.[19]  (Docket 104, pg. 17-18).

Based on the parties' proffer of dictionary definitions and the apparent lack of any clear definition of the "electronic" terms that can be gleaned from the intrinsic evidence, the undersigned recommends that the following construction of the "electronic" terms, which is adopted from the Chambers Science and Technology Dictionary cited favorably by each party, be adopted: pertaining to devices or systems which depend on the flow of electrons.  The undersigned believes that this dictionary definition is at least consistent with the use of the "electronic" terms in the specification and claims of the Patents.

### 3.   "Connecting Electronically" Terms

The construction of the "connecting electronically" terms follows directly from the analyses conducted above for the "connecting" terms and the "electronic" terms. Consequently, the undersigned recommends that the following construction be adopted for the "connecting electronically" terms: connecting through devices or systems which depend on the flow of electrons.

---

[19] Sightsound's primary motive is to avoid a construction of the "electronic" terms requiring that "each and every component of the invention must *communicate exclusively* through the flow of electrons.  (Docket #104, pg. 18) (emphasis in original).  The undersigned believes that Sightsound's concern is not a claim construction issue, but an infringement one best left to the trier-of-fact.

4.   "Transferring Electronically" Terms

The parties appear to indicate in the JDCT Chart that the term "transferring" does not need to be construed.  (See Docket #82, pg. 16).  As a result, the construction of the "transferring electronically" terms also directly follow from the analyses conducted above. Thus, the undersigned recommends that the following construction be adopted for the "transferring electronically" terms: transferring through devices or systems which depend on the flow of electrons.

iv.   Sales-Related Terms

The parties seek construction of a number of "sales-related" terms.  Their proposed constructions are provided below.

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|------|-----------------------------------|-------------------------------|
| "Transferring Money Electronically" Terms | providing payment electronically | *plain and ordinary meaning* |
| "Charging a Fee" Terms | providing payment electronically | receiving money electronically |
| "Electronically Selling" Terms | the transfer of payment and product over telecommunications lines | providing a product or service electronically in exchange for transferring money electronically |
| Sold | Sold | providing a product or service electronically in exchange for money |

The undersigned has reviewed the construction of these terms in the prior R&R, and finds the analysis therein to be thorough, instructive and in accord with the intrinsic evidence. *Sightsound.com*, 185 F.Supp.2d at 472-74.  The parties having shown no intervening caselaw, new evidence or new arguments that impact the viability of Magistrate Judge Benson's prior constructions, the undersigned recommends the constructions set forth below.

1.   "Transferring Money Electronically" Terms

As determined in the prior R&R, the undersigned recommends that the following construction be adopted for the "transferring money electronically" terms: providing payment

28

electronically (i.e., through devices or systems which depend on the flow of electrons).[20]  As set forth in the prior R&R, the undersigned believes that the recommended construction is most consistent with the intrinsic evidence and the overall context of the invention -- the selling and purchasing of digital audio signals -- disclosed in the Patents.  *Id.* at 472-73.

### 2. "Charging a Fee" Terms

While the "charging a fee" terms are addressed in the prior R&R, the ultimate construction recommended therein is not absolutely clear.  However, based on the analysis and the construction of the "transferring money electronically" terms in the prior R&R, as well as the undersigned's review and analysis of the intrinsic evidence, the undersigned recommends that the following construction be adopted for the "charging a fee" terms: requesting payment electronically.  The undersigned believes that the recommended construction is consistent with the claims and the overall context of the invention disclosed in the Patents in that the seller is the one requesting payment from the purchaser for the transfer of the digital audio signals.

### 3. "Electronically Selling" Terms

Consistent with and for the reasons provided in the prior R&R, the undersigned recommends that the following construction be adopted for the "electronically selling" terms: providing a product or service electronically in exchange for providing payment electronically.  *Sightsound.com*, 185 F.Supp.2d at 474-75.

### 4. "Sold"

Akin to the "connecting" terms, the term "sold" is a non-technical term in plain English.  As such, the undersigned agrees with Sightsound that "sold" does not need to be construed for the trier-of-fact.  The intrinsic evidence does not suggest a special meaning for the term "sold" different from its common meaning.

---

[20] For purposes of consistency and clarity, the undersigned has included the recommended construction of the "electronic" terms (provided above) into the construction of the "transferring money electronically" terms.

v.   "Digital Audio Signals"

The term "digital audio signals" is used throughout the specification and claims of the Patents.  In fact, the focus of the invention disclosed in the Patents is "a system and associated method for the electronic sales and distribution of digital audio or video signals . . . from any location which the user has access to telecommunication lines."  (Docket #81-3, pg. 5, col. 1, l. 15-21).

The parties' proposed constructions for this term are provided below:

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|------|-----------------------------------|-------------------------------|
| Digital Audio Signal | digital representations of sound waves | digital data playable as an audible sound wave |

Sightsound's proposed construction is the one adopted by the Court in the N2K case.  Apple essentially contends that this construction is too narrow and would exclude computer-synthesized sound, including Musical Instrument Digital Interface (MIDI).

The prior R&R addressed these issues at length and the undersigned believes that the thorough and instructive analysis of the intrinsic and extrinsic evidence by Magistrate Judge Benson is worthy of deference in this case.  *See Sightsound.com*, 185 F.Supp.2d at 458 and 462-66.  The discussion of the prior art (e.g., records, tapes and compact discs) and the overall context of the invention disclosed in the Patents makes clear that the focus of the invention is the sales and distribution of music that had been converted into digital code.  (See Docket #81-1, pg. 5).  A passage from the Patents is instructive:

> Digital Audio Music is simply music converted into a very basic computer language known as binary.  A series of commands known as zeros or ones encode the music for future playback.  (*Id.* at col. 1, l. 53-56).

Apple has raised no intervening caselaw, new evidence or new arguments that impact or otherwise require the prior construction to be modified.  Consequently, the undersigned recommends that the following construction be adopted for the "digital audio signals" term: digital representations of sound waves.

vi.   <u>"Hard Disk" / "Hard Drive" Terms</u>

The terms "hard disk" and "hard drive" are used throughout the specification and claims of the Patents but are not specifically defined therein.  The Patents merely indicate that "the agent's Hard Disk 10" and "the user's Hard Disk 60" are "commercially available."  (Docket #81-3, pg. 6, col. 4, l. 33-37).  The parties resort to extrinsic evidence to help craft their proposed constructions:

| Term | Sightsound's Proposed Construction | Apple's Proposed Construction |
|------|-----------------------------------|-------------------------------|
| Hard Disk | a permanent storage device utilizing rigid media | a rigid, magnetically coated platter for computer storage |
| Hard Drive | a permanent storage device | a magnetic computer storage medium comprising a rotating disk platter with a read-write head and extensible arm |

The parties agree that the "hard disk" and hard drive" terms relate to memory storage devices or media.  It is instructive that the specification and claims of the Patents also use other "memory device" terms.  For example, the Patents' claims and specification refer generally to "memory", as in "first memory" and "second memory," and also to "random access memory chips", as in "Sales Random Access Memory Chip 20c," "Incoming Random Access Memory Chip 50c" and "Play Back Random Access Memory Chip 50d."  (Docket #81-3, pg. 6, col. 4, l. 18-26).

The overall context of the invention, as disclosed in the specification and claims, makes clear that the "first memory," "second memory" and "hard disk" are intended to be "non-volatile" or permanent storage devices.  For example, the Patents disclose that

> Digital Audio Music . . . is stored onto one piece of hardware, a hard disk, thus eliminating the need to unnecessarily handle records, tapes, or compact discs on a regular basis.  This invention recalls stored music for playback as selected/programmed by the user.  (*Id.* at pg. 5, col. 2, l. 44-49).

Further, the specification notes that

> [w]hen a song is retrieved from the Hard Disk 60 only a replica of the *permanently stored song* is retrieved.  The *permanently stored song* remains intact on the Hard Disk 60, thus allowing repeated playback.  (Docket #81-1, pg. 6, col. 4, l. 60-63) (emphasis added).

In addition, various claims in the '440 patent recite that the "first memory includes a

first party hard disk," the "second memory includes . . . a second party hard disk," and a "second memory" includes "a non-volatile storage portion that stores the desired . . . digital audio signals . . . ." (*Id.* at pg. 9, col. 9, l. 22-23 and 42-47 and pg. 30, col. 3, l. 29-31).

With respect to the "random access memory chips," the specification discloses that these memory chips are designed to "temporarily store" Digital Audio Music for various purposes. (*Id.* at pg. 6, col. 4, l. 53-63). As such, these storage devices are "volatile" storage devices.

The above discussion is all in the way of illustrating that the patentee was aware of and disclosed and claimed various "memory" devices in the Patents. The choice of the specific terms "hard disk" and "hard drive" in the claims is telling when other "memory" terms were available. As used in the claims, the terms "hard disk" and "hard drive" must be presumed to have meanings that are at least different from if not more narrow than the ones for "memory."

Sightsound refers to an expert declaration to support its position that "'hard disk' and 'hard drive' refer to non-volatile storage devices that can be arbitrarily overwritten." (Docket #90, pg. 33). However, Sightsound does not convincingly explain how its proposed construction of "hard disk" and "hard drive" would differ from those for the terms "first memory" and "second memory," which also are permanent storage devices based on the specification and claims of the Patents.

The various dictionary definitions cited by Apple appear to define "hard disk" in terms of a rigid, magnetic storage device.[21] (Docket #91, pg. 32). Not only are these proffered definitions generally consistent with how the terms "hard disk" and "hard drive" are used in the specification and claims, but they are also consistent with the terms "first memory" and "second memory" as used in the claims in conjunction with "hard disk" and "hard drive." Consequently, the undersigned recommends that the following construction be adopted for the "hard disk" term: a permanent, rigid, magnetic storage device.

Turning now to "hard drive," normally different terms are presumed to have different meanings. Clearly, "hard disk" and "hard drive" are different terms. Nevertheless, the undersigned's review of the intrinsic evidence does not reveal a clear indication of a different

---

[21] Sightsound also notes that "[h]ard disks are of the rigid, rotating magnetic-type storage media." (Docket #90, pg. 33, fn. 15).

meaning for the two terms or provide any real guidance as to the meaning of "hard drive."  In fact, the specification of the '440 patent refers to the same component in Figure 1 as both the "Hard Disk 60" and the "hard drive 60."  (Docket #81-3, pg. 3, Figure 1, and pg. 8, col. 7, l. 4-10).

Apple's proposed construction of "hard drive," on the other hand, appears to go too far and is not consistent with the overall context of the disclosed and claimed invention.  The recitation of a "rotating disk," an "extensible arm" and a "read-write head," while based on dictionary definitions, are details that are not contemplated anywhere in the intrinsic evidence and are unnecessary to effectuate the purpose of the invention.  Therefore, while the outcome may be less than desirous, the undersigned believes that the only recourse to construe "hard drive" in a manner that is consistent with the overall context of the specification and claims of the Patents is to adopt the same construction as recommended for "hard disk."  Thus, the undersigned recommends that the construction of "hard disk" also be adopted for the "hard drive" term: a permanent, rigid, magnetic storage device.

### vii.   "Replica"

The construction of the term "replica" was considered at length in the prior R&R.  *See Sightsound.com*, 185 F.Supp.2d at 492-95.  The undersigned has considered the arguments raised by the parties in the briefing and during the Markman hearing, as well as the analysis of Magistrate Judge Benson in the prior R&R.  The undersigned finds the analysis in the prior R&R to be consistent with the intrinsic evidence and aligned with the overall description of the invention and the claim language.  Apple having presented no intervening caselaw, new evidence or new arguments that impact the viability of Magistrate Judge Benson's prior construction, the undersigned recommends the following construction for the "replica" term: a copy, not requiring a complete copy to be stored at one time.

### viii.   "Second Party Hard Disk"

Apple asserts that claim 16 of the '440 patent is indefinite because the term "second party hard disk" lacks antecedent basis in the claims (e.g., claims 12-15) from which claim 16 depends.  (Docket # 91, pg. 48).  Apple is correct that proper antecedent for "second party hard

disk" had been present (in claim 14) prior to the reexamination of the '440 patent, but that the term "a second party hard disk" was deleted from claim 14 during reexamination and replaced with "non-volatile storage portion."  Consequently, there is a mismatch in the claim language of the '440 patent: claim 14 recites a "non-volatile storage portion" and claim 16 (which depends from claim 14 through claim 15) recites a "second party hard disk."  (Docket #81-3, pg. 30, col. 3, l. 34-67).

It is evident from the '440 patent that the patentee replaced the term "second party hard disk" with "non-volatile storage portion" in claim 14, but simply failed to do so in claim 16. The undersigned believes that one of ordinary skill in the art would understand that this was a mistake in claim language and that the "second party hard disk" term in claim 16 actually referred back to the "non-volatile storage portion" term in claim 14.  The undersigned is of the opinion that this type of evident mistake in a patent can be corrected by a District Court.  *See Group One, Ltd. V. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005).  Consequently, the undersigned declines Apple's request to invalidate claim 16 of the '440 patent for indefiniteness.

Based on the above analysis, the undersigned recommends that the "second party hard disk" term in claim 16 of the '440 patent be replaced with the term "non-volatile storage portion of the second memory."[22]

ix.   "Desired Signals" / "Desired Selections" Terms

Apple contends that the term "desired signals" renders "the claims in which they appear indefinite because a person of ordinary skill in the art would be unable to determine whether or when the claims are infringed."  (Docket #91, pg. 49).  In the overall context of the invention as set forth in the specification and claims, it is clear that the term "desired signals" or the term "desired selections" refers to the signals that the second party is interested in and wishes to purchase from the first party.  (See Docket #81-1, pg. 6, col. 3, l. 60-67).  Consequently, the undersigned declines Apple's request to invalidate as indefinite the claims in which the terms "desired signals" and/or "desired selections" appear.

---

[22] The parties have not disputed the meaning of the claim term "non-volatile storage portion."

Based on the above analysis, and further in view of the absence of a proposed construction from Apple, the undersigned recommends that the following construction be adopted for the "desired signals" and "desired selections" terms: chosen signals and chosen selections.

x.   <u>"Transferring Means or Mechanism"</u>

Apple asserts that claim 29 of the '440 patent is indefinite because the term "transferring means or mechanism" lacks antecedent basis, necessary structure or functional description in the claim.  (Docket # 91, pg. 50).  Sightsound essentially admits that "transferring means or mechanism" lacks proper antecedent basis (Docket #104, pg. 25), but responds that the term "means or a mechanism for the first party to charge a fee" serves as the antecedent basis for "transferring means or mechanism."

As with the "second party hard disk" term analyzed above, it is evident that the patentee intended for the "transferring means or mechanism" term to actually read "means or a mechanism for the first party to charge a fee."  The undersigned believes that one of ordinary skill in the art would understand that this was a mistake in claim language and that the "transferring means or mechanism" term in claim 29 should have read "means or a mechanism for the first party to charge a fee."  While the patentee may be guilty of sloppy claims drafting, the undersigned is of the opinion that this type of evident mistake in a patent can be corrected by a District Court and is not of such degree as to warrant an invalidity determination for claim indefiniteness.  *See Group One*, 407 F.3d at 1303.  Consequently, the undersigned declines Apple's request to invalidate claim 29 of the '440 patent for indefiniteness.

Based on the above analysis, the undersigned recommends that the "transferring means or mechanism" term in claim 29 of the '440 patent be replaced with the term "means or a mechanism for the first party to charge a fee."[23]

---

[23] The construction of the disputed claim term "means or a mechanism for the first party to charge a fee" is addressed below.

xi.   "Means plus Function" Limitations

The asserted claims of the Patents contain many "means plus function" limitations, which are construed according to 35 U.S.C. §112, ¶6.  (See fn. 12 *infra*).  As discussed in Section II(C)(3) above, when the word "means" appears in a claim in association with a function, there is a rebuttable presumption that §112, ¶6 applies.  *Callicrate*, 427 F.3d at 1368.  If the Court concludes that §112, ¶6 applies to a claim term, then the Court must first identify the function associated with that claim language and then identify the structure, materials, or acts in the specification corresponding to the claimed function.  *Id.* at 1369.  In this case, except for a few instances addressed below, the parties agree that §112, ¶6 governs the construction of the disputed "means plus function" claim terms.

There is, however, a more significant dispute between the parties: whether, as Apple insists, the disputed "means plus function" claim terms are governed by a new line of cases (i.e., decided after the prior R&R) requiring that the specification disclose an algorithm for performing the claimed function.  (Docket #91, pg. 34-35).

As explained by the Federal Circuit, "[b]ecause general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of that claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112, paragraph 6."  *Aristocrat*, 521 F.3d at 1333.  Instead, the Federal Circuit requires "that the specification 'disclose an algorithm for performing the claimed function.'"  *Noah Sys.,* 675 F.3d at 1312.  If the specification does not disclose an algorithm to perform the function associated with a computer-implemented means-plus-function limitation, the claim limitation is indefinite.  *Id.* at 1319.

Apple contends that all of the "means plus function" claim terms are governed by §112, ¶6 and are indefinite under the *Aristocrat* line of cases for the patentee's failure to disclose algorithms for the claimed functions.  (Docket #91, pg. 30-32 and 34-35).  Sightsound counters that some of the "means plus function" claim terms are actually not governed by §112, ¶6, but that, for the ones that are  governed by §112, ¶6, the specification does disclose sufficient

structure for the claimed functions, consistent with the Court's ruling as set forth in the prior R&R.  (Docket #90, pg. 30-31).

The undersigned will first address those claims terms that Sightsound contends are not governed by §112, ¶6, and then will move on to a discussion of the remaining "means plus function" terms.

### 1. "Means plus Function" Limitations Not Governed by §112, ¶6

#### a. "Means or Mechanism for Transmitting the Signals" Terms

Sightsound contends that the "means or mechanism for transmitting the signals" set of terms is not governed by §112, ¶6 because the claims themselves subsequently recite sufficient structure -- a transmitter connected to the first memory and the telecommunications lines and a receiver connected to a second memory – to rebut the presumption that §112, ¶6 applies. (Docket #90, pg. 41).  Sightsound's position is well-taken.

The undersigned believes that the "transmitter connected to the first memory and the communications lines and the receiver connected to the second memory" language is sufficient structure to perform the claimed function of transmitting the signals from the first memory to the second memory, and therefore rebut the presumption that §112, ¶6 applies.  *See* Phillips, 415 F.3d at 1311; *Cole*, 102 F.3d at 531.  Consequently, the undersigned recommends that the claim construction rules of §112, ¶6 not be applied to the "means or mechanism for transmitting the signals" set of terms.[24]

#### b. "Means or Mechanism for Connecting Electronically" Terms

Sightsound asserts that the "means or mechanism for connecting electronically" set of terms, as recited in claims 11 and 16 of the '734 patent and in claims 24, 31 and 83 of the '440 patent, is also not governed by §112, ¶6.  Sightsound is correct.

---

[24] Because the parties have not disputed the construction of the terms "transmitter" and "receiver," the undersigned has not addressed the meanings of those terms.

In the noted claims of the '734 patent and the '440 patent, the claim language recites that the "connecting means or mechanism comprise a first control unit in possession and control of the first party and a second control unit in possession and control of the second party." (See Docket #81-3, pg. 10, col. 12, cl. 24, l. 47-50).  Apple contends that the recitation of the "first control unit" and the "second control unit" are not "structures well-known to a person of ordinary skill in the art. . . .[and] are 'functional features' that could be implemented in a general purpose computer."  (Docket #91, pg. 43).  Regardless of whether the structures are well-known to one of ordinary skill in the art, it is clear from the Patents that the "Control Unit 20" and the "Control Unit 50" are structural components that are described and shown in the specification.  (Docket #81-1, pg. 3, Figure 1, and pg. 6, col. 3, l. 60-68).  As such, the undersigned believes that their recitation in the above-noted claims is sufficient to overcome the presumption that §112, ¶6 applies thereto.  Consequently, the undersigned recommends that the claim construction rules of §112, ¶6 not be applied to the "means or mechanism for connecting electronically" terms recited in claims 11 and 16 of the '734 patent and in claims 24, 31 and 83 of the '440 patent.[25]

### 2.   "Means plus Function" Limitations Governed by §112, ¶6

The parties agree that the remaining disputed "means plus function" claim terms are governed by §112, ¶6.  As discussed above, the primary dispute regarding these claim terms is whether the specification of the Patents discloses sufficient structure for the claimed functions.

### a.   "Means or Mechanism for Storing the Signals" Terms

Sightsound contends that the claimed "storing" function can be performed by a general-purpose computer, such that disclosure of a general-purpose computer in the specification of the Patent is sufficient structure under §112, ¶6, citing *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011).  (Docket #90, pg. 37-38).  Apple insists that Sightsound's own proffered construction of a "configured" control integrated circuit contradicts its assertion that a general-purpose computer is sufficient, and that *in re Katz* does not apply

---

[25] The constructions of the terms "first party control unit" and "second party control unit" are addressed above on pages 19-20.

because it represents a "narrow exception" to the requirement that an algorithm be disclosed for the claimed function.  (Docket #101, pg. 27).  Sightsound has the better of the argument.

The ability to store data in and retrieve data from memory is a basic function of computers.  As such, the undersigned believes that a "storing" function can be performed by a general-purpose computer and the disclosure of such general-purpose computer is sufficient structure under §112, ¶6 (consistent with *In re Katz* cited above).  Dr. Tygar's Declaration supports this position and the undersigned finds his statement in this regard to be credible. (Docket #90-1, pg. 14-15, ¶42).

For the above reasons, the undersigned recommends that Sightsound's proposed construction be adopted for the "means or mechanism for storing the signals" term: the control integrated circuit, which has been configured to effect the storing of the digital signals into the memory.[26]

### b.  The Remaining "Means plus Function" Claim Terms

Apple asserts that the remaining disputed "means plus function" claim terms are indefinite under the *Aristocrat* line of cases (decided after the prior R&R) for failing to disclose algorithms for the respective claimed functions.[27]  Apple's argument is correct.

A reading of the specification and claims of the Patents reveals a dearth of information as to *how* the claimed functions are performed.  Instead, merely the claimed functions themselves and the results of practicing those functions are disclosed.  No algorithms describing how the claimed functions would be performed by special purpose computers programmed to perform those algorithms are disclosed.

Sightsound points to various passages in the specification and claims to identify algorithms for the claimed functions, all to no avail.  For example, with respect to the "means or mechanism for the first party to charge a fee" terms, Sightsound contends that "a properly

---

[26] Apple has not proffered a construction for the "means or mechanism for storing the signals" term, relying on its argument that the claim term is indefinite.
[27] The undersigned has not relied on or given deference to the "means plus function" claim constructions in the prior R&R because the *Aristocrat* line of cases is relevant caselaw decided after the prior R&R.

programmed control integrated circuit" is the corresponding structure and then cites to the

following passage in the '734 and '440 patents as disclosure of an algorithm:

> Preferably, the means or mechanism for electronically selling includes a means or
> a mechanism for charging a fee via telecommunications lines by the first party to the
> second party at a location remote from the second party location. Preferably,
> the second party has an account and the means or mechanism for charging a fee
> includes means or mechanism for charging the account of the second party.
> Preferably, the means or mechanism for charging the account includes means or a
> mechanism for receiving the credit card number of the second party . . . . The
> means or mechanism for receiving a credit card number preferably is part of the
> control integrated circuit 20b.  (Docket #90, pg. 45-46).

This passage clearly reveals the claimed function -- charging a fee – but does not describe an

algorithm detailing how the special purpose computer would be programmed to accomplish

the claimed function.

Sightsound also refers back to the above passage from the '734 and '440 patent as

support for the following other "means plus function" claim terms: "means or mechanism for

electronically selling the signals" terms (See Docket #90, pg. 47); "means or mechanism for

charging the account" terms (See Docket #90, pg. 48); "means or mechanism for receiving a

credit card number of the second party" term (See Docket #90, pg. 49); "means or mechanism

for charging a credit card number of the second party" term (See Docket #90, pg. 50); and

"means or mechanism for transferring money electronically" terms (See Docket #90, pg. 50-51).

This repetitive citation to a few, detail-scarce, passages in the Patents further amplifies the lack

of disclosed structure for these computer-implemented "means plus function" claim terms.

Turning to the "means or mechanism for connecting electronically" terms in claims 23,

29, 82 and 88 of the '440 patent, Sightsound contends that the disclosed algorithm for the

claimed "connecting electronically" function is "the first memory of the first party (which is

connected to the control integrated circuit that regulates the transfer of signals) initiates a

connection, and then links to and interfaces with the receiver included in the second party

control integrated circuit."  (Docket #104, pg. 29).  Once again, this passage merely discloses

functions and outcomes, not an algorithm by which a computer could be programmed to

perform those functions or attain those outcomes.

Lastly, with respect to the "means or mechanism for playing the signals" terms, Sightsound points to the following passage of the specification for the algorithm:

> To play a stored song, the user types in the appropriate commands on the Control Panel 50a, and those commands are relayed to the Control Integrated Circuit 50b which retrieves the selected song from the Hard Disk 60 . . . *The Control Integrated Circuit 50b then sends the electronic output back to the Stereo Speakers 80* at a controlled rate using the Play Back Random Access Memory Chip 50d as a temporary staging point for the Digital Audio Music.  (Docket #90, pg. 51).

Again, the undersigned believes that this passage discloses functions and outcomes, not an algorithm for performing the claimed functions.

The above specification passages are also instructive when considered in terms of the legal principles and analyses set forth in the *Aristocrat* line of cases.  In upholding a District Court's determination that "means plus function" claims were invalid, the Federal Circuit noted that specification language simply describing the function to be performed or the outcome or result of practicing the function, but not the algorithm by which the function is performed, is contrary to §112, ¶6.  *Aristocrat*, 521 F.3d at 1334.  "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of that claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112, paragraph 6."  *Id.* at 1333.

For the above reasons, the undersigned recommends that the remaining "means plus function" claim terms set forth below be determined to be indefinite and thus invalid: (1) "means or mechanism for connecting electronically" terms in claims 23, 29, 82 and 88 of the '440 patent; (2) "means or mechanism for the first party to charge a fee" terms; (3) "means or mechanism for electronically selling the signals" terms; (4) "means of mechanism for transferring money electronically" terms; (5) "means or mechanism for charging the account" terms; (6) "means or mechanism for receiving a credit card number of the second party" term; (7) "means or mechanism for charging a credit card of the second party" term; and (8) "means or mechanism for playing the signals" term.

5.  Conclusion

The undersigned respectfully recommends that the disputed claim terms be construed in the manner set forth above.


Respectfully submitted,


Gregory L. Bradley
Claim Construction Special Master

56 Altadena Drive
Pittsburgh, PA 15228
(412) 563-0997