# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SIGHTSOUND TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:11-cv-01292-DWA |
| | ) | |
| v. | ) | Honorable Judge Donetta W. Ambrose |
| | ) | |
| APPLE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT APPLE INC.'S OBJECTIONS TO AND REQUESTS FOR CLARIFICATION OF THE SPECIAL MASTER'S REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION (DKT. NO. 142)

Pursuant to the Order of the Court filed March 23, 2012 (Dkt. No. 55), Defendant Apple Inc. ("Apple") respectfully objects to and requests clarification for the following portions of the Special Master's Report and Recommendation on Claim Construction filed October 19, 2012 (Dkt. No. 142) ("R&R") and requests that the remainder of the R&R be adopted as the opinion of the Court.

## I. INTRODUCTION

As set forth by the R&R (Dkt. No. 142 at 1-2[1]), Plaintiff SightSound Technologies, LLC ("SightSound") accuses Apple of infringing U.S. Patent Nos. 5,191,573 ("the '573 patent," Dkt. No. 80-1), 5,675,734 ("the '734 patent," Dkt. No. 80-2) and 5,966,440 ("the '440 patent," Dkt. No. 80-3) (collectively, "the Patents-in-Suit").  After two rounds of briefing by the parties, a technology tutorial, and a claim construction hearing, the Special Master issued the R&R on

---

[1] Docket citations herein are made to the page numbers listed in the headers of the ECF-filed versions.

November 19, 2012.  The R&R addresses (1) the parties' objections to each other's intrinsic and

extrinsic evidence and (2) the proper construction of the various disputed claim terms.

## II.    LEGAL STANDARD

Apple requests that the Court review the R&R pursuant to Fed. R. Civ. Pro. 53(f)(4), which

states that"[t]he court must decide *de novo* all objections to conclusions of law made or

recommended by a master."[2]

The R&R properly sets forth the law concerning claim construction. (Dkt No. 142 at 12-16).

However, two points require clarification.  First, "the construction of a patent . . . is **exclusively**

within the province of the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  A

district court cannot leave an aspect of the construction of a claim term undetermined for the jury to

decide.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When

the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to

resolve it."); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313-14 (Fed. Cir. 2003) (holding

that the district court erred by allowing the jury to impose a requirement of sequential performance

on a series of steps in a claim term when the jury instructions did not specify one).  As described

below, this issue pertains in particular to the construction of the terms "first party"/"second party,"

and "connecting electronically"/"transferring electronically."  Second, "[t]he patentee is bound by

representations made and actions that were taken in order to obtain the patent."  *Typhoon Touch*

*Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011).  As described below, this issue pertains

in particular to the construction of the terms "telecommunication lines" and "telephone lines."

## III.    APPLE'S OBJECTIONS TO THE R&R

Apple's objections to the R&R are as follows.

---

[2] All emphases are added unless otherwise indicated.

**A.      Because SightSound was found to have violated Local Patent Rule 4.2, the Court should require SightSound to pay the fees and costs associated with the preparation of Apple's responsive claim construction brief**

Local Patent Rule ("LPR") 4.2 requires each party, in a Joint Disputed Claim Terms Chart, to identify its "intrinsic evidence for each disputed claim term and phrase" as well as file "an appendix containing a copy of each exhibit of intrinsic evidence cited by the party." The purpose is to provide the opposing party with notice of the intrinsic evidence upon which a party intends to rely. The opposing party may then take into account such intrinsic evidence in making any modifications to constructions prior to the opening claim construction brief or in formulating its arguments for the opening brief.

As the R&R correctly held (Dkt. No. 142 at 5-7), SightSound violated LPR 4.2 by failing to disclose in the parties' Joint Disputed Claim Terms Chart (Dkt. No. 82) or SightSound's appendix (Dkt. No. 81) intrinsic evidence that SightSound then relied upon in its Opening Claim Construction Brief (Dkt. No. 90). The R&R recommended that the Court "consider other remedies" as an alternative to striking SightSound's arguments. (Dkt. No. 142 at 6 n.6). Apple respectfully requests that the Court award to Apple its fees and costs associated with responding to SightSound's Opening Claim Construction Brief that relied on intrinsic evidence SightSound withheld in violation of LPR 4.2.

The R&R emphasizes the primacy of intrinsic evidence in claim construction and underscores the gravity of SightSound's failure to timely disclose it in violation of this Court's Local Patent Rules.[3] The Federal Circuit has approved of remedies when local patent rules have been violated: "[Local patent] rules are essentially a series of case management orders . . . . The court may

---

[3] This Court recently struck Apple's objections to a special master's report and recommendation on the grounds of untimeliness despite its importance to Apple and the lack of any prejudice to SightSound. (Dkt. No. 141).

impose any 'just' sanction for the failure to obey a scheduling order, including 'refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.' Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 37(b)(2)(B)." *O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006).

The intrinsic evidence in this case, including the Patents-in-Suit and their prosecution and reexamination histories, comprises more than six thousand pages. Had SightSound identified which excerpts from these thousands of pages it intended to rely upon, consistent with the purpose of LPR 4.2, Apple could have properly considered and addressed them in its opening claim construction brief (Dkt. No. 91). Instead, Apple was forced to wait after until the parties filed their opening claim construction briefs. As shown in a table compiled by Apple (Dkt. No. 108-1), such excerpts were numerous and SightSound's failure to disclose them prejudiced Apple.

The R&R also states that Apple was on notice that SightSound was at least in part relying on claim constructions adopted by the Court in previous litigation by SightSound involving the Patents-in-Suit. *SightSound.com Inc. v. N2K, Inc.*, 185 F. Supp. 2d 445 (W.D. Pa. 2002). However, the previous claim constructions did not come close to addressing all of the claim construction issues in this litigation because (1) many of the claim terms in dispute were not previously construed at all, (2) even for those that were construed, SightSound proposed different constructions from those it proposed in the prior litigation, and (3) the previous litigation occurred prior to the reexamination of the Patents-in-Suit, which resulted in the generation of new intrinsic evidence. Therefore, any notice that SightSound was relying on the Court's previous claim constructions was insufficient to dissipate any prejudice to Apple.

Thus, to address SightSound's belated disclosure of intrinsic evidence in violation of LPR 4.2, Apple requests that the Court order SightSound to reimburse Apple for Apple's attorneys' fees and costs associated with its preparation of its responsive claim construction brief.

**B.** **The Court should clarify the constructions of "first party" and "second party" to explicitly require that a single entity perform the claimed functions**

Apple respectfully seeks clarification from the Court regarding the R&R's decision to leave to the trier of fact the issue of whether a "party" may include more than one entity or person.[4]  (Dkt. No. 142 at 8 n.18).  As described earlier, claim construction is the exclusive province of the Court, not the jury.

As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 9-13; Dkt. No. 106 at 13-14), a "party" as used in the asserted claims refers to a one entity that performs specified claimed functions.  The claim language itself—with its use of the singular modifier words "first" and "second" to refer to each "party"—imposes the requirement of one entity.  Every asserted claim requires the claimed "first party" to perform at least two functions: (1) receive payment and (2) transmit signals.  The Patents-in-Suit requires the "first party" to do both.  This was confirmed during prosecution by the named inventor, who declared: "One skilled in the art would know that, as found in Claim 1, the 'first party' includes the agent who is authorized to **electronically sell and distribute music**; and the 'second party' is to whom the music is distributed."  (Dkt. No. 80-9 at 4).  Indeed, the term "**a** first party" serves as an antecedent basis for all subsequent uses of "**the** first party" in any given claim.  Accordingly, each instance of "the first party" must refer to **the same entity**.  *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.  It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'").

While Apple agrees with the R&R that the identity of the "first party" could be either a copyright holder or an agent authorized by the copyright holder, Apple seeks clarification that the

---

[4] To the extent the R&R's elimination of the word "single" from the construction of "first party" is interpreted as resolving this issue, Apple objects to it.

"first party" cannot be both at the same time in the context of any given asserted claim.  Each asserted claim requires one "first party" entity to perform all the claimed functions required of the "first party."  While a party may delegate claimed acts to an agent, as recited by the R&R (Dkt. No. 142 at 17-18), if that occurs then that agent must perform all of the claimed acts required of that party.  Because this is a claim construction issue that is the province of the Court rather than the jury, the Court should clarify the construction of "first party" and "second party" accordingly.

### C.   The Court should modify the R&R's construction of "telecommunications lines" to require "end-to-end connectivity"

Apple respectfully objects to the R&R's removal of the language "which requires end-to-end connectivity" from the construction of "telecommunications lines"—thus departing from the Court's previous construction.  (Dkt. No. 142 at 21-23).  The R&R criticizes "end-to-end connectivity" for being "extraneous" and "redundant" because the term "connect" already appears elsewhere in the claims.  (*Id.* at 22).  It is unclear, however, whether the term "connect" includes the concept of "end-to-end."

As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 17-20; Dkt. No. 106 at 15-17), the intrinsic evidence demonstrates that "telecommunications lines" must provide "end-to-end connectivity."  All of the asserted independent claims can be separated into three sets.  A first set recites that the "telecommunications line" "connect[s] . . . the first memory with the second memory."  '573 cls. 1, 4; '734 cls. 11, 16; '440 cls. 23, 29, 82, 88, 95.  A second set recites that "telecommunications lines" "connect[] to the first party control unit and the second party control unit."  '734 cls. 4, 28; '440 cls. 12, 47, 72, 100.  A third set recites that they "form[] a connection between a first memory . . . and a second memory."  '440 cls. 1, 64.  Thus, the claims make clear that "telecommunication[s] line[s]" must be end-to-end.  The specification uses the same language as the claims when describing "the invention."  '573 Abstract, col. 3:8-12; '734 Abstract, col. 3:19-23, 5:47-

6

51, 6:38-45, 7:67-8:3; '440 Abstract, col. 3:20-24, 5:49-53, 6:41-48, 8:3-6.  Finally, Figure 1 shows

telephone lines forming an end-to-end connection between the two control integrated circuits of the

system.  '573, '734, '440 fig. 1:



FIG. 1

During reexamination, SightSound's own expert represented to the Patent Office that the

"invention" of the Patents-in-Suit included "[f]orming an **end-to-end electronic connection over**

**the telecommunications lines** between [the seller and buyer's memories]." (Dkt. Nos. 80-15, 80-

20 & 80-25 at 4).  The R&R misapplies Federal Circuit law by downplaying this statement as a mere

"selected passage." (Dkt. No. 142 at 22-23).  The applicant's characterization of the "invention" to

obtain allowance of the claims, however, should be given great weight, and is typically dispositive.

*See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (limiting claims to a fuel

filter, even though they contained no fuel filter limitation, where the intrinsic evidence referred to

the fuel filter as "this invention" or "the present invention").  In *Microsoft Corp. v. Multi-Tech Systems,*

*Inc.*, the applicant similarly provided a "summary of the invention" during prosecution of the patent-

in-suit that described the claimed system as "establish[ing] a point-to-point connection between

telephone equipment on each end of the line."  357 F.3d 1340, 1349 (Fed. Cir. 2004).  The Federal

Circuit held that such language "does not describe just the connection at the 'ends' of the clamed

communications system," but instead required "communicating directly over a telephone line."  *Id.*

Here, too, the Court must require "telecommunications lines" to require end-to-end connectivity, as it "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO." *Id.*

      **D.**    **The Court should clarify that the constructions of "telecommunications lines" and "telephone lines" exclude non-electronic communications, such as wireless connections**

      Apple respectfully seeks clarification regarding the R&R's construction of "telecommunications lines" and "telephone lines" to exclude non-electronic communications, such as wireless communications.  While the R&R construed both terms as requiring an "electronic medium" and acknowledged Apple's argument about wireless connections (Dkt. No. 142 at 24 n.18), it did not address or analyze Apple's argument about wireless connections.  As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 15-17; Dkt. No. 106 at 18-20), non-electronic communications, including wireless connections, should be excluded.

      The prosecution history requires this reading, as the named inventor of the Patents-in-Suit defined "telephone lines" as "electrical lines" by using the phrase "'telephone lines 30' (electrical lines)." (Dkt. No. 80-9 at 6).  *See N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005) (holding that patentee's proposed construction of "re-entrant portion" did not adequately account for the applicant's parenthetical description in the prosecution history of "re-entrant portion" as "(i.e. those wall portions disposed inwardly of the lowermost points of the base upon which the container rests)").  Although the R&R dismisses this definitional statement as a mere "single instance" (Dkt. No. 142 at 24), in so doing the R&R again errs in ignoring the dispositive effect of definitional statements by the applicant in securing allowance of the patent. Because such statements serve a public notice function, the public is legally entitled to rely on them. *See, e.g., Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what

he declares during the prosecution of his patent."); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("HHI's argument therefore reduces to a request for a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning.  Such an argument is inimical to the public notice function provided by the prosecution history. The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention. … Were we to accept HHI's position, we would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies.").

Moreover, as filed on June 23, 1988, the Patents-in-Suit disclosed and claimed only "telephone lines" as filed.  It was not until years later, on December 11, 1991, that the applicant attempted to amend the specifications and claims to replace "telephone lines" with "telecommunication link" to "connect[] . . . the first memory with the second memory."  (Dkt. No. 80-6 at 6).  The USPTO rejected the claim as indefinite because "the 'telecommunication link' is not well connected in the system."  To overcome that rejection, the applicant amended the phrase to its present form of "telecommunications line."  (Dkt. No. 80-7 at 7, 16).  Therefore, a "line" must be different from a "link"—a broader term that would encompass a wireless connection.  In fact, as understood by a person of ordinary skill in the art, a "line" is physical, unlike an intangible "link."

In the same amendment, the applicant attempted to distinguish the claims from Lightner. (*Id.* at 20-21).  As prior art cited in the prosecution history, Lightner constitutes intrinsic evidence. *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).  Lightner referred to wired "standard telephone dial **lines**" and "picture phone trunk **line**" as extending from its disclosed vending machines to a central office exchange.  (Dkt. No. 94-6 at 12, col. 3:46-62).

9

Alternatively, Lightner also disclosed transmission between the vending machine and central station using a wireless "microwave [transmission] **link**." (*Id.* at 10, fig. 12 element 165; *id.* at 17, col. 14:30-52). Thus, Lightner confirms that one of ordinary skill in the art would understand that "link" includes wireless transmissions and that "line" does not.

Also during prosecution, the applicant notably did not use the term "line" to refer to wireless communications. For example, he referred to "phone or cable lines" as "just about everywhere" while a "cellular call" could be "made literally everywhere." (Dkt. No. 80-12 at 15). By doing so, the applicant distinguished the wireless communications of a "cellular call" from "lines" by pointing out a difference in their accessibility, which would make sense only if a "line" was physical while a "cellular call" was not. Therefore, the Court should clarify that the constructions of "telecommunications line" and "telephone line" exclude non-electronic communication such as wireless connections. To further clarify, the Court may modify the constructions to require "an electronic line" as proposed by Apple.

**E.    The Court should clarify that "connecting electronically" or "transferring electronically" require that the connection or transfer is accomplished through the flow of electrons**

Apple respectfully seeks clarification of the R&R's construction that "connecting electronically" is "connecting through devices of systems which depends on the flow of electrons" and that "transferring electronically" is "transferring through devices or systems which depend on the flow of electrons." In particular, it should be clarified that "connecting electronically" requires the connection to be through the flow of electrons and that "transferring electronically" requires the transfer to be through the flow of electrons. The R&R again left to the trier of fact to decide the issue of whether these terms require "each and every component of the invention [to] communicate exclusively through the flow of electrons." (Dkt. No. 142 at 27 n.19). As explained above, claim construction is the exclusive province of the Court, not the jury.

As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 24-26; Dkt. No. 106 at 21-23), "connecting electronically" and "transferring electronically," and their related terms, require communication through the flow of electrons.  For example, wireless connections and fiber optic cables do not communicate through the flow of electrons and thus do not "electronically connect" or "electronically transfer" anything.  Instead, they communicate through light and radio waves, respectively.  It is not enough that each of the communicating devices is itself "electronic" because its **internal** components communicate with each other electronically; the claim language requires that the "connecting" or "transferring" **between** the two devices must be performed "electronically."

The intrinsic evidence requires this.  As described earlier, the reexamination history explicitly states that the "invention" of the Patents-in-Suit includes "[f]orming an **end-to-end electronic connection** over the telecommunications lines between [the seller and buyer's memories]." (Dkt. Nos. 80-15, 80-20 & 80-25 at 4).  Therefore, the entire connection, not just the devices at each end, must be "electronic."  The prosecution history also describes "telephone lines"—the only connection medium disclosed by the Patents-in-Suit as originally filed—as "electrical lines."  (Dkt. No. 80-9 at 6).  In other words, the lines themselves must be electrical or "electronic."

By requiring exclusive communication through the flow of electrons, the Court also would resolve ambiguities caused by the R&R's constructions of "telecommunications lines" and "telephone lines" as requiring an "electronic medium."  The Court should clarify that the "medium" must depend on the flow of electrons, and that it excludes any non-electronic medium that happens to connect devices or systems that depend on the flow of electrons.

**F.     The Court should clarify that "payment" in the constructions of "transferring money electronically" and related terms requires the transfer of money**

Apple requests clarification about the R&R's construction of "transferring money electronically" terms, "charging a fee" terms, and "electronically selling" terms to require "payment" instead of the transfer of money.  (Dkt. No. 142 at 28-29).  Specifically, Apple requests that the Court clarify whether "payment" requires the transfer of money.  As set forth in Apple's Opening Brief (Dkt. No. 91 at 27), plain and ordinary meaning, consistent with the intrinsic evidence, requires transfer of money.  Thus, the mere provision of credit card information, without more, cannot constitute "payment."  In many cases, credit card information may be provided for identity verification purposes, which is very different from "payment."  (*Id.*).  Therefore, the Court should clarify that "payment" requires the transfer of money.

**G.     The Court should modify the R&R's construction of "digital audio signals" and construe it as "digital data playable as an audible sound wave"**

Apple respectfully objects to the R&R's construction of the claim phrase "digital audio signals" as "digital representations of sound waves," as proposed by SightSound, instead of "digital data playable as an audible sound wave," as proposed by Apple.  Apple's objection is based on two independent grounds.

First, the R&R incorrectly requires that a "digital audio signal" **originate** as a sound wave (i.e., a sound recording), rather than be **playable** as one, and thus excludes computer-synthesized sounds.  As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 29-31; Dkt. No. 106 at 25-27), the objectives allegedly achieved by the Patents-in-Suit with respect to "digital audio signals"—electronic sales and distribution, storage and retrieval, playback, and prevention of copying ('573 col. 2:10-24)—are the same whether such signals originate from sound waves or from computer synthesis.  Indeed, the sole passage quoted by the R&R—"Digital Audio Music is simply music converted into a very basic computer language known as binary" ('573 col. 1:53-54)—refers

only to "music," not "signals."  Moreover, the passage does not equate music with a sound wave; music need not be in audible form, such as sheet music.  Immediately afterwards, the passage recites encoding music "**for future playback**."  '573 col. 1:54-56.  Thus, the emphasis is on how music is **played**, not how it was created.

As one example, the artificiality of the R&R's construction is illuminated when considering how to treat "modules"—sound files available in 1987 that bundled digital representations of sound waves with instructions on how to play them.  (Dkt. No. 94-16).  Even though modules contained sound waves, SightSound's expert contended that they did not constitute "digital audio signals" because they included computer instructions.  (Dkt. No. 104-3 ¶¶ 20-21).  However, as the Court previously found, any digital representation of sound waves must include instructions on how to play them.  185 F. Supp. 2d at 466.

Second,  as confirmed by SightSound's expert, the R&R's construction requires that "digital audio signals" must be of sufficient quality by focusing on the origin of a signal rather than its intended result:

> Q. So, in your view, in your reading as a person of ordinary skill in the art, the patent claims referring to digital audio signals, you think that that **covers only quality digital audio music** as described by Mr. Hair in the specification?
>
> A. **Yes**.

(Dkt. No. 115-1 at 28, p. 105:13-18).

> Q. So is it your opinion that poor quality music cannot be [a] digital audio signal?
>
> A. Well, in the context that Hair is speaking of, he's explicitly talking about quality, **quality music**.

(*Id.* at 29, p. 108:3-7).  Yet, SightSound's expert admitted that the Patents-in-Suit gave no guidance about how to determine quality:

> Q. How does one go about determining whether something is quality or not quality for purposes of determining if they're digital audio signals?

13

A. … you know, **there's not a clear test that's expressed in these patents**.

(*Id.* at 30, pp. 110:19-111:1).  By focusing on the origin rather than the intended result of a signal as a sound wave, the R&R's construction introduces fatal ambiguity to the term and renders it indefinite. Such a construction should be avoided.  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ("When claims are amenable to more than one construction, they should when reasonably possible be interpreted to preserve their validity.").

**H.     The Court should add the requirement of "rotating media" to the R&R's constructions of "hard disk" and "hard drive"**

Apple respectfully requests modification of the R&R's construction of "hard disk" and "hard drive" as "a permanent, rigid, magnetic storage device" to the extent that it excluded rotating media.  Consistent with Apple's proposed construction, SightSound has admitted that a "hard disk" includes rotating media, and the R&R cites to SightSound's admission in support of the Special Master's recommended construction.  (Dkt. No. 142 at 32 n.21; Dkt. No. 90 at 33 n.15).  There being no dispute about this, Apple requests that the constructions for "hard disk" and "hard drive" be modified as "a permanent, rigid, magnetic storage device **using rotating media**."

**I.     The Court should modify the R&R's construction of "replica" and construe it as "a complete copy"**

Apple respectfully objects to the R&R's construction of "replica" as "a copy, not requiring a complete copy to be stored at one time."  As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 35-36; Dkt. No. 106 at 30-31), the term "replica" is used in the asserted claims in relation to storage of a complete copy of a digital audio signal or digital video signal in either the Sales Random Access Memory of the First Party or the Play Back Random Access Memory of the Second Party.  For example, the asserted claims recite, *e.g.*, "a sales random access memory chip … for storing a replica … **to be transferred**." '734 cl. 4.  "To be transferred" confirms that a complete copy must first be stored in the sales RAM before transfer.

14

Also, the specification requires storage of the replica **before** sending to speakers for

playback:

> When a song is retrieved from the Hard Disk **60** only **a replica of the permanently stored song is <u>retrieved</u>**.  The permanently stored song remains intact on the Hard Disk **60**, thus allowing repeated playback.  The Control Integrated Circuit **50***b* <u>**stores the replica**</u> onto the Play Back Random Access Memory Chip **50***d* at a high transfer rate.  The Control Integrated Circuit 50b **then** sends the electronic output to the Stereo Speakers 80 at a controlled rate using the Play Back Random Access Memory Chip 50d as a temporary staging point for the Digital Audio Music.

'734 col. 5-16.  It is clear from this passage that the "replica" is of "the permanently stored song,"

not a portion thereof.

During prosecution of the '734 patent, the Examiner rejected as indefinite the applicant's use

of the term "replica."  In response, the applicant offered the following explanations:

> The Examiner questions in regard to Claim 9, at lines 5-7, that the function of the replica of the desired . . . signals to be stored in the sales RAM is not clear and is not functionality [sic] associated and participated within the claimed system.  Applicant has amended Claim 9 to identify that the sales random access memory chip is electronically connected to the first party hard disk and is **for the purpose of storing a replica of the desired digital video or digital audio signals of the first party's hard disk to be transferred from the first party control unit**.  Furthermore, at line 19, the "first party hard disk" has been replaced by -- sales random access memory chip -- to more clearly define applicant's claimed invention and the function of the sales random access memory chip in the claimed invention.  In this way, it is now clear that the plurality of digital audio or video signals are stored in the first party hard disk, but **those desired video or audio signals which are to be transferred from the first party control unit are <u>replicated</u> from the first party hard disk and <u>then</u> <u>stored</u> in the sales random access memory chip so they can be electronically transferred from the sales random access memory chip**.

and

> The Examiner also questions on line 4 -- what the "replica of the desired . . . signals" means.  Furthermore, the structural relationship between the second party hard disk and the playback random access memory does not support the functional language "for storing a replica . . . signals".  Applicant has amended Claim 11 to refer to the "replica . . . signals" to be of the second party hard disk and not the replica of desired signals from the sales random access memory chip.  Thus, **it is clear that the desired . . . signals are <u>replicated first</u> from the first party hard disk in the sales random access memory chip in preparation for transfer.  Upon transfer,**

**they are received by the second party control unit and stored in the second party hard disk** where they can be accumulated with other desired digital . . . signals to, for instance, create a library.  When it is desired that the desired . . . signals are to be played, **the desired . . . signals of the second party hard disk are <u>replicated</u> in the playback random access memory chip <u>so they are ready</u> for playback.**

(Dkt. No. 80-10 at 23-24).  As reflected above, the applicant consistently explained that the "replica"—not a portion—is stored (i.e., exists) in its entirety in a RAM at one time—after replication and before transmission or playback.  Therefore, a "replica" should be construed as "a complete copy" and without the extraneous language "not requiring a complete copy to be stored at one time" that improperly imports concepts not in the term "replica."  *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("It is improper for a court to add extraneous limitations to a claim, that is limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.").

**J.      The Court should reject the R&R's construction of "desired signals" and "desired selections" and hold those terms to be indefinite**

Apple respectfully objects to the R&R's construction of "desired signals" and "desired selections" as "chosen signals" and "chosen selections," respectively.  As set forth in Apple's Opening and Response Briefs (Dkt. No. 91 at 49-50; Dkt. No. 106 at 36-37), these claim phrases should render the claims in which they appear indefinite because a person of ordinary skill in the art would be unable to determine whether or when the claims are infringed.  More specifically, the asserted patents do not provide any basis on which a person of ordinary skill in the art could judge *ex ante* whether any particular signal stored on any particular memory is "desired."  By substituting the word "chosen" for the word "desired," the R&R implies the requirement of a "choosing" step, which does not appear in the asserted claims.

Because the claim phrases "desired signals" and "desired selections" fail to delineate what is claimed (and what is not), the claims in which they appear are indefinite.  *Halliburton Energy Serv., Inc.*

*v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) ("Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims.").

### K.     The Court should reject the R&R's construction of "the transferring means or mechanism" in claims 29 & 88 of the '440 patent and find it to be indefinite

Apple respectfully objects to the R&R's replacement of the phrase "the transferring means or mechanism" in claims 29 and 88 of the '440 patent with "means or mechanism for the first party to charge a fee." *See* Dkt. No. 142 at 35.  The R&R agrees with Apple that the phrase lacks an antecedent basis in those claims and was a "mistake." *Id.*  However, the R&R misapplies the law by stating that "this type of evident mistake in a patent can be corrected by a District Court."  The case cited by the R&R, *Group One, Ltd. v. Hallmark Cards, Inc.*, states that "[a] district court can correct a patent **only if … the correction is not subject to reasonable debate** based on consideration of the claim language and the specification."  407 F.3d 1297, 1303 (Fed. Cir. 2005).

In this case, the appropriate correction is subject to reasonable debate.  Where "the transferring means or mechanism" is used in other claims, it unmistakably refers to a "means or mechanism for transferring money electronically," not "means or mechanism for the first party to charge a fee." *See* '734 cls. 11; '440 cls. 23, 82.  As the R&R holds, the phrases "transferring money electronically" and "charging a fee" have different meanings: the former being "**providing** payment electronically" and the latter "**requesting** payment electronically."  (Dkt. No. 142 at 28-29.)  The two are not synonymous, and therefore the appropriate correction is unclear: whether "the transferring means or mechanism" should be "means or mechanism for the first party to charge a

fee," as stated by the R&R, or the earlier "means or mechanism for the first party to charge a fee" should be "means or mechanism for transferring money electronically."

Thus, because there are multiple ways to correct the mistake, and it is not clear which way is necessarily appropriate, the claims at issue are indefinite. *See Novo Indus., LP v. Micro Molds Corp.,* 350 F. 3d 1348, 1358 (Fed. Cir. 2003) ("Since we cannot know what correction is necessarily appropriate or how the claim should be interpreted, we must hold [the claim] invalid for indefiniteness in its present form.") Therefore, "the transferring means and mechanism" lacks an antecedent and is indefinite. *Cf. Halliburton Energy,* 514 F.3d at 1249 ("[A] claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable.").

## IV.    CONCLUSION

Apple respectfully requests that the Court reject or modify the R&R as set forth above and adopt the remainder as the opinion of the Court.

Respectfully submitted,


Dated: December 10, 2012                    /s/ Eric T. Syu

James R. Batchelder (Admitted Pro Hac Vice)
 james.batchelder@ropesgray.com
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone: (650) 617-4000
Facsimile: (650) 617-4090

Ching-Lee Fukuda (Admitted Pro Hac Vice)
 ching-lee.fukuda@ropesgray.com
Eric T. Syu (Admitted Pro Hac Vice)
 eric.syu@ropesgray.com
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Phone:  (212) 596-9000
Facsimile: (212) 596-9090

Robert J. Ridge
 rridge@thorpreed.com
William M. Wycoff
 wwycoff@thorpreed.com
**THORP, REED & ARMSTRONG**
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15222-4895
(412) 394-7711

Attorneys for Defendant
**APPLE INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2012 the foregoing was served upon all counsel of record via the CM/ECF Electronic filing system of the United States District Court for the Western District of Pennsylvania.

/s/ Eric T. Syu